FILED

10/14/2022

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 12, 2022 Session Heard at Austin Peay State University[1]

## STATE OF TENNESSEE v. DAVID WAYNE EADY

**Appeal from the Criminal Court for Davidson County**
**No. 2018-B-952     Cheryl A. Blackburn, Judge**

_____

### No. M2021-00388-CCA-R3-CD

_____

Defendant, David Wayne Eady, was convicted by a jury of eleven counts of aggravated robbery and one count of attempted aggravated robbery. The trial court sentenced Defendant as a repeat violent offender and imposed eleven concurrent sentences of life without the possibility of parole. The trial court ran the life imprisonment sentences concurrently with a fifteen-year sentence for the attempted aggravated robbery conviction. On appeal, Defendant contends 1) the trial court abused its discretion in denying his motion to sever the offenses; 2) the trial court abused its discretion in denying his motion to suppress his statements; 3) the trial court abused its discretion in denying his motion to disqualify the District Attorney General's Office, 4) the evidence was insufficient to support his conviction for aggravated robbery as charged in count eight of the indictment; and 5) his convictions for aggravated robbery as charged in counts one and two of the indictment violate Double Jeopardy as a matter of plain error. Because the facts and circumstances support only one conviction for aggravated robbery as charged in counts one and two, we merge the two counts, and remand for entry of amended judgments in counts one and two reflecting the merger. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, and Modified in Part.**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J. joined. CAMILLE R. MCMULLEN, J., filed a separate opinion concurring in part and dissenting in part.

---

[1] Oral Argument in this case was heard before students on the campus of Austin Peay State University in Clarksville, Tennessee.

Jeffrey A. DeVasher, Assistant Public Defender (on appeal), Jared Mollenkoff, Julie Bigsby, Assistant Public Defenders (at trial), Nashville, Tennessee, for the appellant, David Wayne Eady.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Megan King, Joey Clifton, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

This case involves eleven aggravated robberies committed in various convenience stores located throughout Davidson County during the month of November 2017. Defendant was originally indicted with seven counts of aggravated robbery on March 18, 2018. The State sought a superseding indictment on May 7, 2018, charging Defendant with twelve counts of aggravated robbery. Less than one month after the indictment, the State filed a notice of Defendant's status as a repeat violent offender for purposes of sentencing. The notice relied on five prior convictions for aggravated robbery.

## *Motion to Sever the Offenses and Suppression Motion*

Defendant filed a motion to suppress his statement to two detectives made after he was arrested for driving on a revoked license. The suppression motion alleged that Defendant's statement was involuntary because he was under the influence of heroin and that his statement was the product of police coercion and a violation of his due process rights under the federal and state constitutions.

Defendant also filed a motion to sever the offenses under Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure. He argued that joinder of the offenses was improper because the crimes were not part of the same criminal episode and proof of one count was not admissible in a trial of the other counts. The State argued that joinder of the offenses was proper under permissive joinder Rule 8, Tennessee Rules of Criminal Procedure.

The trial court held a bifurcated hearing on October 17, and 29, 2018, to litigate the suppression motion and the severance motion. The State admitted into evidence a chart of the twelve charged offenses based on the information provided in the police incident reports, an aerial map identifying the locations and dates of the offenses, a collection of surveillance footage screenshots of the robber, Defendant's rights waiver document, a DVD recording of the Defendant's police interview before (Part I) and after a smoke break

(Part II) and a transcript of both interviews, and both an audio recording and transcript of the smoke break.

At the first hearing held on October 17, 2018, Officer John Stanfield of the Metropolitan Nashville Police Department ("MNPD") testified that on December 11, 2017, he pulled over a gold 2001 Toyota Camry for an expired license plate in the vicinity of Glenrose and Nolensville in South Nashville. At the time of the stop, Officer Stanfield was aware that the Camry was a vehicle of interest in an ongoing investigation by detectives in the Midtown Precinct. Therefore, Officer Stanfield requested backup for the stop. Defendant was driving the Camry and had passengers. There were outstanding warrants for the passengers. Officer Stanfield did not search the Camry and he could not recall whether the back-up officers searched Defendant's Camry during the stop.

When Officer Stanfield frisked Defendant for weapons, he found 0.1 gram of heroin in Defendant's jeans which Officer Stanfield turned over to the property room. Officer Stanfield denied that Defendant turned over any syringes during the stop. He explained that had he found any syringes, he would have collected them and they would have been listed on the property room sheet but then the syringes would have been photocopied and disposed of because it is not safe to keep syringes in the property room as evidence.

Officer Stanfield did not recall Defendant slurring his speech, having glassy or bloodshot eyes, or being slow in responding to his questions. He did not observe Defendant "swallowing a lot" or "sweating." He added that Defendant was appropriately dressed for the weather. Because it was daylight, Officer Stanfield testified that he would have noticed if Defendant's eyes were dilated. Based on his observations, he did not ask Defendant whether he was intoxicated and did not have Defendant perform any field sobriety tests. Officer Stanfield placed Defendant under arrest and transported him to the Midtown Precinct to speak with the detectives. On redirect examination, Officer Stanfield stated that he would have had Defendant perform a series of field sobriety tests had he believed Defendant to be under the influence.

On cross-examination, Officer Stanfield testified that his "face to face" interaction with Defendant before and after his interview, was "a matter of minutes, not a matter of hours." Officer Stanfield confirmed that he transported Defendant to the downtown booking station after the interview. He could not recall whether Defendant was charged with having an expired tag. Officer Stanfield was not involved in the robbery investigations and did not observe or participate in Defendant's interview at the Midtown Precinct. He learned of the alert on Defendant's car from the Midtown Precinct the morning of the arrest.

- 3 -

Jonathan McGowen, a detective in the Midtown Hills Precinct of the MNPD testified that in November and December 2017, he was investigating a string of aggravated robberies of commercial businesses. Defendant was developed as a suspect when his car was observed in the parking lot of the November 24 robbery at the Delta Express/Mapco at 440 Harding Place by the surveillance camera of a family medical clinic located next door.[2]

Detective McGowen responded to the November 24 robbery and observed that the description of the robbery was similar to the ones he was already investigating. During his investigation, he reviewed footage from the surveillance camera of the medical clinic next to the gas station and saw a late model gold Toyota Camry pull up to the store minutes before the robbery. Both the initial driver and the passenger exited the Camry. The driver put on a hoodie and entered the gas station and the passenger sat down in the driver seat. The car had a sticker on the back, two hurricane style rims on the right side of the Camry, and a paint blemish on the center of the hood. The driver side front hubcap was missing. The video showed the driver exit the store and get into the passenger side of the Camry. The Camry was seen fleeing the scene westbound toward Interstate 65.

Detective McGowan was alerted to another robbery in the Nolensville Pike corridor the next day. Consequently, while patrolling the area near the corner of Nolensville Pike and Tanksley Avenue, Detective McGowan observed a gold Toyota Camry matching the description of the vehicle he had seen from the surveillance video of the robbery the day prior. Detective McGowan saw Defendant standing at the rear of another gold Toyota Camry which was broken down. Defendant then removed the license plate from the working Camry and put it on the broken-down Camry. Detective McGowan testified that there was another man seated in the working Camry. He approached the two men, identified himself and spoke with Defendant and another man named Richard Black. Detective McGowan called for police assistance to run a search on Defendant and Mr. Black because he did not have his computer.

Defendant explained that he was switching license plates because he was making payments on the broken-down Camry which belonged to a family member. Detective McGowan testified that the Camry occupied by Defendant and Mr. Black matched the distinctive features of the gold Camry seen at the robbery on November 24. According to Detective McGowan, Defendant matched the physical description of the robber of the November 24 robbery while Mr. Black matched the physical description of the man who waited in the car during the robbery. Moreover, Detective McGowan learned that Defendant was left-handed. He explained that the robber was left-hand dominant and used

---

[2] We will identify the locations of the robberies as introduced in the record.

his left hand to hold the gun and carry out the robbery. Detective McGowan confirmed that both men were cooperative and were permitted to leave.

Defendant gave his cell phone number to Detective McGowan which he later used to obtain Defendant's cell phone records. Detective McGowan received the records on December 3, 2017. He reviewed the records and observed that Defendant's cell phone pinged off the cell tower located less than half a mile from the location of the November 24 robbery. Defendant's cell phone also pinged near the area of the Nolensville Pike robbery on November 25, as well as the November 18 robbery in Columbia, and the November 26 robbery on Thompson Lane which were part of his investigation.

On December 5, 2017, two days after he received Defendant's cell phone records, Detective McGowan obtained a court order to install a GPS device on Defendant's gold Toyota Camry. Detective Armstrong installed the GPS later that day. Detective McGowan acknowledged that no robberies were committed while the GPS was on Defendant's car. Detective McGowan also placed "an alert" for Defendant. Detective McGowan explained that "an alert" informs officers that a person is wanted for questioning. On December 11, 2017, Detective McGowan received word from Officer Stanfield that he saw Defendant at a McDonald's on Nolensville Pike and asked whether Defendant should be brought in for questioning. As requested, Officer Stanfield brought Defendant to the Midtown Hills Precinct for questioning.

Detective McGowan was not present when Detective Armstrong reviewed the waiver of rights form with Defendant. However, he observed the interaction from the video recording room down the hall from the interview room. Defendant's waiver of rights form was exhibited to the hearing and showed that Defendant signed the form at 5:30 p.m. The waiver of rights form has a section where the interviewer asks the interviewee whether he is intoxicated or otherwise impaired. On the form, Defendant denied that he was intoxicated. Detective McGowan explained that at the time Defendant was interviewed, it was not department policy to record the reading of rights to an interviewee; thus it was not recorded in this case. Department policy has since changed and the reading of one's rights is now recorded as part of an interview.

Detective McGowan testified that both as a police officer, and off duty, he has observed people under the influence of alcohol and drugs. He was with Defendant over two hours on the day of Defendant's interview, and Defendant exhibited no signs that he was under the influence. Detective McGowan recalled Defendant mentioning several times that he was "clean," had been released from a detox center a day before the interview, and was planning to go to a more intensive rehabilitation center the next day.

Defendant mentioned that his mother was the president of a United Steelworkers Union in Nashville. She had driven school buses for thirty years. Detective McGowan found this fact to be important because at a robbery in Franklin on December 2, 2017, a green hoodie with the words, "President of the United Steelworkers Union" was found at the scene.

Detective McGowan stated that during Defendant's interview, they paused for Defendant to take a smoke break. Defendant spoke to Detective Armstrong during the smoke break, and Detective Armstrong recorded their conversation on an audio device. Detective McGowan became aware of the recording only "moments" before the hearing and promised to supply the recording to the District Attorney's Office the day after the hearing.

At the end of Defendant's interview, he was permitted to call his mother, and the call was recorded. Defendant was heard telling his mother that "[he] could pass a drug test right now" and that he had not used heroin "since [he] got out of detox."

Detective McGowan denied that he or Detective Armstrong told Defendant that his mother was at risk of being charged with the robberies. Defendant's mother came up during the interview because witnesses to the November 5 robbery spotted a white Mercury Grand Marquis at the scene. Detective McGowan was aware that Defendant's mother drove a white Mercury Grand Marquis consistent with the eyewitness's account of the suspected robber's vehicle and mentioned this to Defendant during the interview.

During the interview, Defendant told the detectives that his goal in committing the aggravated robberies was to get money to fuel his opioid habit. Detective McGowan recalled Defendant saying, that "the driving force" behind people committing aggravated robberies was drugs. When he could not get employment, Defendant turned to "what he knew," robbery. Defendant stated that "[he] wasn't doing it to get rich, [he] was just doing it to get enough drugs, heroin, to hold [him] over for a couple of days."

Detective McGowan was present for the entire interview except for the reading of Defendant's rights and the smoke break. None of the property taken during the robberies was ever recovered. Defendant wore different hoodies for each robbery and discarded them after each robbery. Defendant also discarded the gun he used which was a "fake" gun he had painted black. Defendant did not reveal where he had discarded the gun.

On cross-examination during the hearing on the suppression motion, Detective McGowan stated that he did not have a photograph or surveillance footage of Defendant's mother's car at one of the robberies and did not present a photograph of her car to Defendant during the interview. He maintained that he told Defendant that eyewitnesses

had seen a car similar to his mother's at one of the robberies. Although there was surveillance footage of the robbery at the November 20 Hermitage Twice Daily robbery, charged in count nine, footage was not retrieved. The officer who was dispatched to this robbery took a screenshot of the robber from the video. The screenshot was used in the State's chart of the offenses.

At the October 29, 2018 hearing, the defense continued its cross-examination of Detective McGowan. Detective McGowan confirmed that the timeframe of Defendant's interview would be accurately reflected in the video recording. The interview was divided by the smoke break in the middle. Detective McGowan agreed that Part I and Part II of the interview lasted nearly two hours altogether. He also agreed that six times during Part I of the interview, Defendant stated that he would not confess. When asked whether he brought up Defendant's mother in response to Defendant's refusal to believe that "the truth in this case is not going to set him free," Detective McGowan stated that he would not dispute his response if so reflected in the transcript of Part One of the interview.

Detective McGowan reiterated that he did not talk to Defendant during the smoke break and that Defendant spoke only to Detective Armstrong. He denied that he spoke to Detective Armstrong about what was said during the smoke break before commencing Part II of the interview. Since the interview, the two detectives' only discussion about the smoke break was that Detective Armstrong had found the recording of the smoke break. Detective McGowan did not recall whether Defendant's eyes were red after the smoke break but stated that Defendant appeared as if he had been crying. He clarified that the smoke break was not recorded on Detective Armstrong's body camera and consisted of an audio recording only.

Detective McGowan had learned from his investigation that Defendant was staying at his mother's house and that his mother owned a Grand Marquis. Detective McGowan explained that when he talked about Defendant's mother, it was in the context of going to Defendant's mother's house to look for evidence regarding the robberies. Detective McGowan agreed that he told Defendant "more than just once" that Defendant's mother was "tied up" in the case because her car, a white Grand Marquis, was seen at one of the robberies. He clarified that Defendant's mother was not involved in the commission of the robbery:

> What I meant, "momma was tied up in that would've been that her car," her vehicle was used in it. So, his mother wasn't present at the robbery, but her vehicle would've been used in the commission of a robbery. So that's what I meant when I said tied up in it. It was that her vehicle alone was involved in this incident, a vehicle that she owned.

Detective McGowan agreed that Defendant made no outright admissions during Part I of the interview. However, Defendant made statements that matched evidence Detective McGowan had gathered in the investigation. In Part II of the interview after the smoke break, Defendant confessed to committing most of the robberies.

Detective McGowen stated that during his surveillance of Defendant, he did not see Defendant use drugs. He was then directed to the following passage of Part I of the interview wherein Defendant admitted to using drugs:

Defendant:                      If you been watching me the way you have been watching me then you see me pull over and, and, do the drugs.

Detective McGowen:        Uh-huh.

Detective McGowen did not deny the accuracy of the transcript. However, he explained that he never "actually saw [Defendant] use drugs" because he could not see inside Defendant's car.

The timeframe of the investigation included robberies that occurred between November 2-30, 2017. Detective McGowen thought initially that Defendant had committed a robbery which occurred on November 6. His investigation showed that Defendant was not involved in that robbery. To his knowledge, Defendant was involved in a robbery in Franklin on November 30. Due to its location outside of Davidson County, the Franklin robbery was not included in Detective McGowen's case. He agreed that the time of day in which the robberies occurred varied. He agreed that the earliest robbery occurred at 3:20 p.m. and the latest robbery occurred at 12:28 a.m. Detective McGowen added that there was similarity among the twelve robberies in the manner in which the robbery occurred and the description of the suspect. He testified that the suspect "always" arrived in a vehicle, and not on foot. He explained that a K-9 unit was called to the scene for several of the robberies to determine whether the suspect left on foot. The foot track of the suspect came to a "stop point" indicating that the suspect got into a vehicle. Detective McGowen acknowledged that evidence of a vehicle was limited to the investigation by the K-9 unit and a description of a Grand Marquis sedan by an eyewitness because in the majority of the robberies, there was limited external video surveillance.

Detective McGowen confirmed that Defendant stole cash in eleven of the twelve robberies. In the November 2 robbery of the Dollar General, no cash was taken because Defendant could not open the cash register. Detective McGowen agreed that Defendant stole cartons of cigarettes in two of the nine robberies. Detective McGowen testified about each robbery in chronological order regarding the description of the suspect. He

acknowledged that the victims of each robbery described the suspect "differently, so they weren't all exactly the same." However, he maintained that "a majority" of the descriptions were "pretty similar" despite a range regarding the age of the robber. Detective McGowen agreed that the description of the robber's clothes changed from robbery to robbery. He specifically noted that the hats, hoodies, and facial covering varied in each robbery. He also acknowledged that the robber's manner of handling customers in the store varied among the robberies.

In terms of investigating other potential suspects, Detective McGowen was aware that a witness at the November 11 robbery at Walgreens on Donelson Pike described the robber as a black man in the 9-1-1 call. However, he could not be certain how the witness described the robber because he did not specifically investigate that robbery. Similarly, he did not investigate the November 20 robbery at the Twice Daily where one of the victims identified a "Dylan Bauer" as the potential suspect. Nor did he investigate the November 18 robbery at the Delta Gas Station on Murfreesboro Pike where a witness identified a "James Worrick" as the possible suspect.

Defendant, age fifty-five, testified that he went as far as the tenth grade in school. He acknowledged that he used heroin and stated that he was on heroin when he gave his statement to the detectives on December 11. He stated that he used one-tenth of a gram an hour before he was arrested. He injected himself in the leg with heroin. He was in his car and was observed by the other occupants in the car. He used a syringe to inject himself and deposited the syringe in the side console of his car. He testified that there were three needles. He did not use all the heroin he had because he wanted to save some of it for when he became "dope sick." He testified that he still had one-tenth of a gram of heroin in his pants pocket folded inside a lottery ticket when he was arrested. The police did not find the heroin the first time Defendant was searched. According to Defendant, Officer Stanfield told Defendant that if he revealed that he had a syringe, he would not be charged. Based on that information, Defendant told Officer Stanfield that he had syringes in the side console of his door. Officer Stanfield then opened the car door and ordered Defendant to step out. Defendant testified that he saw Officer Stanfield and a second officer collect the syringes and put them in a plastic bag. Defendant told the officers that the syringes were his but he did not tell them he had used heroin that day. Defendant described how one-tenth of a gram of heroin affected him physically:

> It makes me kind of slow, it makes my mouth dry, get sweats sometimes, sometimes I get chills. It depends. You know, it varies, sweats and chills, and makes my eyes pupil. I mean my pupils get real small, and maybe a little nauseous sometimes.

- 9 -

Defendant added that when he is high on heroin, he does not "think right" and makes poor decisions. He stated that the effects last six to eight hours. He testified that he had injected himself with heroin "an hour and a half to two hours" before the interview. He maintained that he was high on heroin when he talked to Detective McGowen and Detective Armstrong on December 11 and remained under the influence throughout the interview. Defendant recalled being "scared" during the interview because he had heroin in his pocket. He acknowledged that he told the detectives that he was clean and denied having used heroin. He explained that he lied because he did not want the detectives to find the heroin in his pocket. He also told the detectives that he had been to a detox facility which was true. However, he stated that he had used heroin since he was released from the detox facility and that his tolerance for heroin was less following detox.

Defendant's drug use was "the only one" thing that embarrassed his mother. His mother was aware that he had entered a detox facility. She believed that he had remained sober when he was released. He confirmed that he talked to his mother on December 11 and told her that he had not used any drugs after he left detox because it would "break her heart" given "all she did to get me into the detox program." Defendant testified that he lived with his mother who had COPD and had difficulty breathing and "getting around." He stated that they are "very close." She had other children but Defendant was her firstborn.

Defendant was aware of the three parts of the interview and confirmed that he talked about his mother a lot during the interview. He recalled that he talked mostly to Detective Armstrong about his mother. Based on the interview in Part I, Defendant was convinced that surveillance footage had documented his mother driving her car as the getaway vehicle in one of the robberies. Defendant denied that his mother was involved in the robberies. He was very upset by the suggestion that his mother was involved in the robberies. He was also convinced that the detectives would talk to his mother. He feared that such a conversation would cause his mother to suffer a stroke or a heart attack.

After Part I of the interview, Defendant feared for himself and his mother. He testified that he confessed to the robbery after talking to Detective Armstrong during the smoke break:

> Because when we went outside to smoke a cigarette, that's when Det. Armstrong really started working on me about being a momma's boy and had me crying out there, and he was talking about how big of a momma's boy he was too, and how he knew he would protect his mother at all cost and all that. You know, he played me like that out there, being a momma's boy, had me crying and everything. And that's when I told him that, you know, yeah, I confessed to the robbery.

Defendant testified that being high made him "so emotional" during the smoke break. He stated that he would not have been so emotional but for being high on heroin. Defendant stated that he and the detectives did not talk about his mother's car in Part II of the interview because he had already decided to confess to the robberies during the smoke break so the police would "leave [his] mother alone." Defendant reiterated that he was convinced the police were going to arrest his mother because he was told a witness had identified his mother and her car at the scene of one of the robberies.

On cross-examination, Defendant testified that Officer Stanfield was untruthful when he testified that no syringes were found in Defendant's car. He confirmed that Officer Stanfield did not have Defendant perform a field sobriety test. Defendant was not charged with driving under the influence ("DUI") and a DUI officer was not called to the scene of the arrest. Officer Stanfield told Defendant that he would write him a citation for driving on a revoked license.

Defendant testified that he has had ten to fifteen interactions with the police and acknowledged that he had been interviewed several times similar to how he was interviewed by Detective McGowen and Detective Armstrong.

Defendant first tried heroin when he was twenty-five years old and would often use it "every day." He was released from prison in 2015 and continued using heroin every day. He restated that he was in detox for six days. He had been out two to three days when he was arrested. He agreed that he did not tell the detectives in the interview that he was experiencing chills. He also agreed that during the interview he was not visibly sweating and did not vomit or ask to use the bathroom because he was sick. Although he had not watched the interview, he conceded that his appearance and voice in the interview was "probably" similar to how he sounded in his testimony at the hearing.

Defendant testified that he admitted to committing the robberies because he was concerned that the police would go after his mother. They insinuated that his mother had been seen driving a getaway car and he testified that detectives told him they were going to arrest his mother. He acknowledged that when he was asked whether he was under the influence during the recitation of his rights, he denied that he was. Defendant conceded that he had not read the transcripts of the interview or watched the interview. He further conceded that he did not remember "exactly everything that happened, every word that was said." He acknowledged that he told his mother on the phone call that "[he] could pass a drug test right now." He also acknowledged telling his mother on the same phone call that he committed the robberies because he was on heroin.

When queried by the trial court, Defendant revealed that he had never taken a case to trial. He denied that he had previously given a statement following an arrest. He clarified that he previously had been questioned by the police about crimes he had committed, but in those interviews, Defendant did not confess.

The State argued that the counts should not be severed because the crimes were part of a continuing plan or conspiracy and committed towards a common goal or purpose of procuring money to support Defendant's heroin addiction. The defense argued that proof of each robbery was not admissible in a trial of the other robberies to prove identity and the location and the time-frame of the robberies were inadequate to support consolidation to prove the suspect's identity.

The trial court took the matter under advisement. On December 10, 2018, the trial court entered a thorough and clear order denying both motions. In denying Defendant's motion to suppress his December 11, 2017 statement, the trial court credited the testimony of Officer Stanfield and Detective McGowen. Each witness testified that Defendant did not exhibit any signs of being under the influence or exhibit difficulty in responding to questions. The trial court found that their testimonies about Defendant's state of mind was supported by the video recordings of Parts I and II of the interview, and the audio recording of the smoke break. Based on the circumstances, the trial court concluded that "Defendant knowingly and voluntarily waived his *Miranda*[3] rights regardless of whether he was high on opiates." The trial court also rejected Defendant's contention that the detectives coerced him into making incriminating statements. The trial court again relied on the interview recordings and the corresponding transcripts. The trial court found that Defendant's characterization of the interview was unsupported by the video of the interview. Based on the totality of the evidence, the trial court found "no evidence of coercive police activity or exertion of any improper influence to render Defendant's confession" involuntary.

In denying Defendant's motion for severance and holding that the counts should be consolidated under Rule 14(b) of the Tennessee Rules of Criminal Procedure, the trial court held that identity was a material issue in the case and that the multiple robberies constituted a continuing plan or conspiracy. The trial court found that proof establishing each count was "so related to each other that proof of one tend[ed] to establish the others."

Prior to trial, Defendant filed a motion for the trial court to reconsider its decision on the motion for severance taking aim at the trial court's finding that identity was a material issue because the court failed to offer analysis of the probative value of the evidence. Defendant maintained his position that the robberies did not constitute a continuing scheme or plan because "a shared motivation to get money for drugs is

---

[3] *Miranda v. Arizona,* 384 U.S. 436 (1966).

insufficient to prove a common scheme or plan even when the offenses share some similarities." Without distinctive facts, Defendant argued that proof of any one robbery was inadmissible in a trial for the other robberies.

Following a hearing and arguments, the trial court denied the motion to reconsider the severance motion, holding that joinder was proper based on the similar nature of the robberies, the narrow time frame in which the crimes were committed, the limited geographical region where the offenses occurred, and that money from the robberies were used to purchase heroin.

### Motion to Disqualify Davidson County District Attorney's Office

Defendant also filed a motion to disqualify the Davidson County District Attorney's Office ("Office") from prosecuting the case because the elected District Attorney, Glenn Funk ("General Funk"), had represented Defendant in a criminal case in Cheatham County in 1989 wherein Defendant pled guilty to aggravated robbery and served a ten-year sentence in the Department of Correction in exchange for dismissal of aggravated kidnapping and aggravated burglary charges.

In its Notice of Defendant's status as a repeated violent offender, the State relied on Defendant's 1989 aggravated robbery conviction to classify his status as a repeat violent offender. Defendant alleged that the prosecutor, Megan King ("ADA King") sought permission from General Funk to seek a repeat violent offender designation and that General Funk considered Defendant's prior convictions, and approved ADA King's request to seek the designation. Defendant moved to recuse the District Attorney's Office from the case, or should the trial court recuse only General Funk, to strike Defendant's status as a repeat violent offender as an alternative remedy.

On February 19, 2019, the trial court heard arguments on several pending motions, including Defendant's motion to reconsider the severance motion, motion to disqualify the District Attorney's Office, and various other motions not the subject of this appeal.

Defendant testified that he was arrested in March 1989 in Cheatham County on charges of aggravated robbery and aggravated kidnapping. His parents retained General Funk to represent him on the two charges. Defendant stated that General Funk negotiated a plea agreement whereby Defendant served a ten-year sentence in the Department of Correction. Defendant recalled that he met General Funk two or three times to discuss the facts of the case and specifically whether the State would be able to convict him as charged in a trial. Defendant stated that he disclosed confidences to General Funk during the course of the representation and that General Funk worked with the co-defendant's attorney on the case. Defendant testified that he told General Funk he was displeased with the outcome

of his case. Defendant did not believe there was evidence to convict him, yet he was talked into taking the ten-year plea deal.

Defendant stated that he next saw General Funk in 2014 when he attended a driver's license reinstatement event at Antioch High School. Defendant introduced himself to General Funk. Defendant testified that General Funk remembered him and his mother who was with Defendant at the license reinstatement event.

Defendant testified that General Funk had represented Defendant's brother in 1996 on charges of aggravated robbery in Davidson County, Rutherford County, and Williamson County. Defendant recalled that his brother received a seventy-five-year sentence. Defendant stated that his parents were unhappy with General Funk's representation and that his mother and his brother expressed their unhappiness to General Funk. According to Defendant, his brother and General Funk got into an argument leaving the courtroom about whether his brother should testify and regarding the length of his brother's sentence. Defendant admitted that because he was incarcerated, he did not observe what happened in the courtroom between his brother and General Funk.

General Funk testified that when he was elected to the position of Davidson County District Attorney, he contacted the Board of Professional Responsibility regarding ethical issues related to the prosecution of former clients and was advised as follows:

> They advised that it was not going to be a problem for our office to prosecute folks who were former clients. That if there was a case where or when there were cases where they were prosecuting former clients, that I could not divulge any of the information about that case or anything, any information that I had gotten about those earlier cases from my clients. But that as long as no confidences were betrayed, that there is no ethical issue with the district attorney's office of the Twentieth Judicial District prosecuting cases against clients that I had represented in my private practice.

General Funk explained that the decision to seek the death penalty or life without the possibility of parole ("LWOP") is made after discussing the case with a number of people including himself and both deputy district attorneys. By contrast, the decision to seek a sentence of LWOP based on a repeat violent offender designation is made at "the team leader level." General Funk stated that the Office policy for seeking enhanced punishment of LWOP was put in place by his predecessor since at least 2004.

In Defendant's case, General Funk testified that ADA King requested a meeting wherein she expressed her intent to seek LWOP and gave a two-to-three-minute synopsis about the case with respect to the charges and the criminal history. He did not think that

ADA King showed him the documents she filed with the notice for repeat violent offender but he did not recall specifically. General Funk was "sure" ADA King stated Defendant's name but he did not recognize it. Although he did not recall running into Defendant at Antioch High School, he did not dispute Defendant's testimony because he had attended a number of driver's license reinstatement events at a high school or middle school.

When General Funk first discovered that he had previously represented Defendant, he did not recall the charge or the county in which the representation had taken place. He remembered Defendant's mother, Mary Eady, who he described as "awesome." He added, "I don't know what all has happened in [Defendant]'s life, but I know that . . . he was born to a great mother." When asked to review one of the documents attached to the notice, General Funk denied that he saw it when ADA King first talked to him about the case. He explained that he would have remembered seeing the document during their conversation because he would have seen his name at the top of the document and would have recognized his signature. General Funk identified several documents that were filed during his representation of Defendant: a Memorandum of Authorities in Support of Motion to Suppress Identification, a Motion to Suppress Identification, Petition for waiver of trial and request for acceptance of guilty plea, a discovery request, and the judgment.

General Funk stated that he did not recall anything about his representation of Defendant "other than [Defendant]'s face[.]" For instance, he did not recall the facts surrounding the motion to suppress the pretrial identification. He recalled only that Defendant's co-defendant in the prior aggravated robbery was represented by Suzanne Lockert who is now a judge in Cheatham County.

General Funk did not recall "anything about" his representation of Defendant's brother, Mark Scott Eady. He explained that he had "no idea" Defendant had a brother until he read the motion to disqualify the Office. It was only upon reviewing the motion that he learned that he had in fact represented Defendant's brother. General Funk identified several documents related to Defendant's brother's case.

General Funk affirmed that there is "a document" which discusses the repeat violent offender designation and how the decision to seek the designation is "a team leader decision." He stated that the office does not keep statistics on the number of times an assistant district attorney seeks the designation in the office. He did not think the designation was sought "more than a handful" of times during his tenure, but he added that "because [he is] not usually notified, [he does not] know." He testified that "[Defendant's case] was the only time in four and a half years" that he was notified about seeking the designation.

On cross-examination, General Funk confirmed that he was unaware that ADA King was talking about a former client when talking about Defendant's case. He agreed that it was "possible" that ADA King did not identify Defendant by name. General Funk stated that ADA King "usually" keeps a file with her when talking about a case and refers to it for clarification but does not hand him any documents.

General Funk did not recognize that the Office was prosecuting Defendant when he and ADA King had their initial conversation about the case. He stated, "If his name had come up during our conversation, it didn't register that our conversation was about someone who I had represented thirty years ago." He denied that the fact the Defendant and his brother were former clients of his had any bearing on the decision of the Office to file a notice for the repeat violent offender designation. He recalled that "the decision was actually made by [ADA King] as the team leader" although he acknowledged that ADA King "did talk to [him] about the case[.]" General Funk believed that ADA King had made the "right decision on behalf of the [O]ffice."

The trial court asked General Funk several questions about the repeat violent offender statute, Tennessee Code Annotated section 40-35-120. First, the trial court asked whether the statute "eliminates a great body of people" from qualifying as a repeat violent offender because a qualifying defendant must have served "separate periods of incarceration" and multiple offenses committed in one episode constitutes only one qualifying conviction. General Funk agreed with the trial court that few people would qualify for the designation. Second, the trial court asked whether the statute requires the court to mete a sentence of LWOP once it is determined that a defendant has qualifying convictions:

> It appears that it is a mandatory situation for the court. And that is once it is determined by the court that they have the right qualifiers and they are then convicted, the court has no choice but to sentence them to life without the possibility. And it further says that the court shall refuse to accept a plea agreement that fails to recommend that a defendant with a sufficient number of designated prior convictions be sentenced as a repeat violent offender.

> So the law as I read it, and correct me if I'm wrong, is that if you all had a plea petition where somebody who has prior, two prior separate convictions, and there's another one right in front of me, I can't take it. Because you haven't given a notice. Isn't that what it says - the court shall refuse to accept a plea agreement if your agreement is to another aggravated robbery?

General Funk agreed that in the preceding scenario, a trial court appears to lack discretion and must reject such a plea agreement. General Funk further agreed that although a court

has little discretion under the statute but to reject a plea agreement where the State fails to recommend that a defendant with a sufficient number of designated prior convictions be sentenced as a repeat violent offender, nothing in the statute precludes the State from modifying the indicted offense to avoid the repeat violent offender designation and the mandatory sentence of LWOP.

On redirect examination by the defense, General Funk confirmed that he had another conversation with ADA King about the case the week before the hearing on the motion to disqualify the Office. He recalled being "surprised" that a former client was the subject of the intended designation. He asked her whether they had talked about the fact that he had represented Defendant in their earlier conversation, and ADA King replied that they had not. When asked whether their conversation was limited to the motion to disqualify or included "any other aspect of prosecution," General Funk replied:

> There may have been just (sic) remind me again why we were seeking life without parole, and she would've gone through what his record was and what these events that lead to this indictment were. But it would've been less than a minute on that topic. It was a courtesy review of what your claims were and what the case was about.

At that meeting, General Funk restated his opinion that it was proper for the Office to seek LWOP in Defendant's case.

During the argument portion of the motion hearing, the defense stated that "the only question before the court is whether or not the disqualification of [General] Funk should be vicariously applied to the remainder of his [O]ffice based on his prior representation of [Defendant] and his involvement in the current case." The defense urged the trial court to consider the motion by using the analysis set forth in *State v. Willie Claybrook,* No. 3, 1992 WL 17546 (Tenn. Crim. App. Feb. 5, 1992), *State v. Tate,* 925 S.W.2d 548 (Tenn. Crim. App. 1995), and *State v. Stephen Berline Orrick,* 592 S.W.3d 877 (Tenn. Crim. App. 2018), and Rule 1.11 of the Tennessee Rules of Professional Conduct. The defense argued that General Funk "engaged in this case in a meaningful manner" when he reiterated his opinion to ADA King that it was appropriate for the Office to seek the repeat violent offender designation in Defendant's case after he learned that he had previously represented Defendant.

The trial court pointed out that the defense was "overlooking the mandatory nature of the statute" and pushed back on whether prosecutors retain discretion under the statute:

> The Court: So the only way not to get involved in this statute is if they decline to prosecute him on aggravated robbery.

The defense:    Yes. But the statute does not take away discretion entirely from either [General] Funk or [General] King. They have –

The Court:      Well, doesn't it?  If – they're being prosecuted on aggravated robbery, there is no choice.

The defense:    If they choose to continue to prosecute them under aggravated robbery.

The Court:      Yeah. I was going to say.  So what you're saying is because they are following the fact that it's alleged to be an aggravated robbery, that, because it's mandatory.  There's no discretion here if the prosecution is for aggravated robbery.

The defense argued that prosecutors possess discretion by choosing to seek the designation and by having the authority to amend an offense in order to offer a plea that does not invoke the statute.  The trial court noted that "a finite set of people" qualify as a repeat violent offender due to the statute's requirement of having two or more qualifying convictions involving separate periods of incarceration.

The trial court took the matter under advisement and issued a written order denying the motion to recuse the Davidson County District Attorney's Office from prosecuting the case.  In its order, the trial court accredited General Funk's testimony and ADA King's statement that ADA King did not state Defendant's name during their initial conversation about the case.  The court held that "[r]egardless" of whether Defendant was identified in the initial conversation, the court found "no basis for recusal in light of the mandatory nature of the repeat violent offender sentencing statute."  The trial court focused heavily on the statute and found that Defendant qualifies "unequivocally" as a repeat violent offender based on his 1983 aggravated robbery conviction in Cheatham County and his three 1993 aggravated robbery convictions in Davidson County.

*Trial*

### Count 12 – Dollar General – Eighth Avenue South – November 2

Defendant was charged with eleven counts of aggravated robbery and one count of attempted aggravated robbery.  At trial, the State offered proof of the twelve counts in chronological order.  Brenda Wilson testified that on November 2, 2017, she was working at the Dollar General at 1201 Eighth Avenue South when a "tall" man wearing a black mask entered the store around 5:45 p.m. armed with a gun.  When the gunman approached

her at the cash register while pointing the gun directly at her, Ms. Wilson testified that she "took off running" to a nearby gas station. The employees there called the police. Ms. Wilson could not identify the robber, and she did not know whether he took anything. She believed that the robber's gun was real. The robbery was captured on the store's surveillance camera. This footage was exhibited to the jury. Ms. Wilson identified herself as the person seen behind the store cash register.

On cross-examination, Ms. Wilson confirmed that there were two other people working in the store at the time of the robbery, a manager and an employee on her first day. Ms. Wilson clarified that she considered the robber to be "tall" because he was taller than her. Ms. Wilson testified that she is "five-six, five seven." She could not describe how much taller the robber was than her. She was the only person in the front of the store. She explained that her manager usually remains in the office.

Seven latent fingerprints were lifted at the store but lacked comparative value. The features on the impressions were insufficient to compare and determine whether they matched Defendant's fingerprints. According to the cell phone data records, Defendant's cell phone communicated with a cell phone tower in the area of the Dollar General at 6:26 p.m. on November 2, 2017.

**Count 10 – Walgreens – Nolensville Pike – November 5**

On November 5, 2017, Jonathan Latham was working at the Walgreens at 2819 Nolensville Pike when a man dressed in "a darkish hoody" and sporting black gloves entered the store. Mr. Latham testified that the gloves stood out because the weather was "warmer than usual" that day for gloves. Mr. Latham suspected that "something was about to go down" because the man was wearing sunglasses and a bandana over his face. As he suspected, the man approached Mr. Latham at the cash register brandishing a black pistol in his left hand. The man held the gun "to his side," but pointed it at Mr. Latham and told Mr. Latham, "this isn't a joke, give me the f****** money." The robber ordered Mr. Latham to give him the money inside the register and underneath the register. Mr. Latham gave the robber the money as ordered. Mr. Latham estimated that the robber stole around $400. The robber left as the assistant manager was dialing 9-1-1. From where he was standing, Mr. Latham could not tell which direction the robber went or whether the robber got into a vehicle.

Mr. Latham was unable to identify the robber because he could only see the man's forehead. On cross-examination, Mr. Latham revealed that the man was white with "wrinkles in his forehead." Mr. Latham could not make out the make or model of the gun but "[a]bsolutely" believed that it was real. Multiple cameras inside the store captured the incident from various angles. Mr. Latham testified that he watched one of the surveillance

recordings which was played for the jury. On cross-examination, Mr. Latham acknowledged that he could not recall whether the robber's hoody had a design because once he saw the gun, he was not attentive to the robber's clothing. The robbery lasted "a minute or two." He agreed that if the surveillance footage showed that the robber was at the counter less than twenty seconds, the clock was accurate. In his interview, Defendant confessed to committing this robbery.

### Count 11 – CVS – Nolensville Pike – November 9

On November 9, 2017, Shino Hussain was working the register at the CVS pharmacy at 4709 Nolensville Pike when a man in a "hooded shirt" entered the store at 3:20 p.m., armed with a gun and demanded money. Ms. Hussain recalled being in "shock" because the man repeatedly demanded that she "give [him] the money." She could not identify the man because his face was covered. She recalled only that he was "[p]ossibly Caucasian." The store's multiple surveillance cameras documented the robbery. The surveillance footage of the robbery was played for the jury. While it was being played, Ms. Hussain identified the portion of the footage where the robber changes the gun from hand to hand.

On cross-examination, Ms. Hussain confirmed that on the surveillance footage, another female employee could be seen at the register right before the robber entered the store. Ms. Hussain testified that this employee ran away when she saw the man robbing the store but managed to dial 9-1-1. Ms. Hussain recalled telling the police that the robber was tall and was around six feet in height. She added that his face was covered "except his nose." Ms. Hussain agreed that she may have said that the robber's face was either sunburned or "uniquely red." She confirmed that the CVS was located on the corner of Nolensville Road and Haywood Lane.

In his interview, Defendant admitted to robbing the CVS located at the end of Haywood Lane. He recalled that the clerk was either a Hispanic or Arabic woman. Defendant's cell phone data showed that he made nine calls on his phone from 3:04-3:58 p.m. These calls were connected to towers in South Nashville near the CVS.

Fingerprints lifted at the store had no value for comparison. The features present in the fingerprint impressions were insufficient to render a definitive conclusion of identification or exclusion and therefore insufficient to determine whether the lifted prints matched Defendant.

### Counts 1 and 2 – Walgreens – Donelson Pike – November 11

Jazlyn Oropeza, Josianne Hunter, and Beverly Adcock were working at the Walgreens located at 518 Donelson Pike on November 11, 2017, around 7 p.m. when a white man dressed in a gray "hoody" or "sweater" robbed the store. Ms. Oropeza testified that the man pointed the gun at her and Ms. Adcock and threatened to "bust[] [their] head[s] off" unless they gave him all the money in the registers. The man first came to Ms. Adcock and then to Ms. Oropeza. The gunman pointed the gun at Ms. Hunter when she came to help Ms. Oropeza open her register. Ms. Hunter opened the register and gave the money to the gunman. Ms. Oropeza testified that the robber stole upwards of $300 or more. According to Ms. Oropeza, the gunman stood five feet ten inches and weighed 150 pounds. He wore glasses and a black mask which covered his face below the nose. The gun appeared to have some scratches and looked real to Ms. Oropeza. After the gunman left, the three employees went to the back of the store and dialed 9-1-1.

Surveillance footage of the robbery was played for the jury during Ms. Oropeza's testimony. Ms. Oropeza pointed out how the robber held the gun in his left hand. She identified herself, Ms. Adcock, Ms. Hunter, and the robber on the video. The footage also included a view outside of the store.

On cross-examination, Ms. Oropeza added that the robber wore jeans. She confirmed that the robber went back and forth between her register and Ms. Adcock's register. On the video, the robber is seen standing next to a Red Box machine.

Ms. Hunter testified that she was working at the photo counter in the store when she saw a man walk in and point a gun at Ms. Oropeza at the front counter and order her to give him money. Because Ms. Oropeza did not appear to understand what was happening, Ms. Hunter walked over to help her open the cash drawer. The man then pointed the gun at Ms. Hunter, who opened the drawer and gave him money. She believed he took around $1,500. She testified that the robber was "definitely white." Because he was shorter than her, she stated that he was about five feet, nine and a half inches tall. He wore a gray sweater, black pants, and a face mask. She believed that the gun was real. Ms. Hunter stated that she did not see or hear the robber say or do anything to Ms. Adcock. Ms. Hunter also watched the store's surveillance footage of the robbery and affirmed that the footage accurately reflected what had occurred that day.

Ms. Adcock testified that the robber first approached Ms. Oropeza because she was stationed at the main register. Ms. Adcock was across from her at another register. Ms. Adcock recalled that the man entered the store, pointed the gun at Ms. Oropeza's face and demanded that she "give [him] the money." According to Ms. Adcock, Ms. Oropeza replied, "Are you kidding me?" Ms. Adcock advised Ms. Oropeza to "do what he says." Ms. Oropeza could not open the cash drawer because the register had to be "cleared off." While Ms. Oropeza was struggling with her register, the robber looked at Ms. Adcock and

demanded the money from the drawer and below the drawer. He made the same demand to Ms. Oropeza. After he grabbed money from Ms. Oropeza's register, the gunman "reached in" and grabbed money from Ms. Adcock's register and quickly exited the store. Ms. Adcock could not describe how the robber looked but remembered what he wore: a hoody, a toboggan, and sunglasses. She testified that the robber had a pistol and the barrel of the gun was slightly smaller than a quarter. Like her fellow employees, she believed the gun to be real. Ms. Adcock recalled that the robber arrived and left the store on foot. She stated that the robber went to the right out of the store in the direction of a K-Mart. Ms. Adcock confirmed that she dialed 9-1-1. She listened to the audio recording of the call and watched the surveillance footage of the robbery. She testified that the surveillance footage accurately documented the robbery.

On cross-examination, Ms. Adcock testified that the robber wore a light-gray or light-blue hoody. The toboggan was navy blue which the robber wore underneath the hoody. She recalled that the robber was taller than her. Ms. Adcock testified that she is five feet tall.

In his interview, Defendant stated that he waited for the store to empty out of customers because he did not want to harm anyone. He recognized himself in the screenshots of the surveillance footage taken outside the store. He stated that he was wearing a gray coat.

### Count 3 – Delta Express/Mapco – Old Hickory Boulevard – November 15

Timothy Bushong testified that at approximately 9:45 p.m., on November 15, 2017, a man entered the Delta Express/Mapco at 15131 Old Hickory Boulevard, pointed a pistol at him and demanded money from the register. Mr. Bushong took money out of the register and put it in a bag as ordered but the man said "that wasn't enough money" and ordered Mr. Bushong to give him the money beneath the cash register drawer. Mr. Bushong informed the gunman that there was no money under the drawer and raised it to show him. The man knew the store had a safe because he ordered Mr. Bushong "to drop a tube out of it." Mr. Bushong explained that the safe contains a tube which holds additional cash because only a certain amount of money is kept in the register. Mr. Bushong pushed a button, which dropped a tube holding additional cash from the safe. He placed the money from the tube into the bag, which the man took and exited the store. Mr. Bushong believed that the man took $160 to $170. Mr. Bushong was unable to describe the man because the man was wearing a hoody which covered most of his head, sunglasses which concealed his eyes, and a handkerchief or bandana over his face. He was able to determine that the man was white because there was space between the handkerchief and the sunglasses exposing his skin. Mr. Bushong added that the man also wore gloves and left the premises on foot. Mr. Bushong watched the footage from the store's surveillance cameras which was played

for the jury during his testimony. He affirmed that the footage accurately documented what had occurred in the store.

On cross-examination, Mr. Bushong confirmed that he gave a description of the robber to the 9-1-1 dispatcher and the police officer who was dispatched to the scene. Mr. Bushong testified at the preliminary hearing where he described the robber as five foot six or five foot seven. Mr. Bushong stated that the doors to the store have a height indicator. He relied on the height indicator as the man left the store. He also looked at the height indicator on the video as the man is seen leaving the store. Mr. Bushong testified that he has previously had to use the height indicator on the door to judge a person's height. He could not give a judgment on the man's weight. Mr. Bushong agreed that the surveillance footage from outside the store did not show the man get in or out of a vehicle. As for the gun, Mr. Bushong acknowledged that he is not familiar with guns but did observe that the man's gun appeared to be an older model. He explained that the newer guns are sleeker in shape. He has observed guns over the years and observed a change in design.

When shown surveillance photographs from the incident during his interview, Defendant told police, "That's me. So I guess I did that." In addition, analysis of Defendant's cell phone data showed that his phone communicated with cell towers near the Delta Express/Mapco several times between 9:40 p.m. and 9:58 p.m. He made two outgoing calls at 9:49 p.m., 9:50 p.m., and 9:53 p.m.; and received calls at 9:54 p.m. and 9:58 p.m.

## Count 4 – Delta Gas Station – Murfreesboro Pike – November 18

Raphael "Ralph" Donald Calhoun testified that on November 18, 2017, he was placing cigarettes on display as part of his duties as an employee of the Delta Gas Station located at 2601 Murfreesboro Pike around 5:30 p.m., when a man, wearing a mask, entered the store, pointed a "high point firearm" at him and demanded money. Mr. Calhoun complied, after which the robber demanded a "ca[s]e of cartons of cigarettes." The robber then ordered Mr. Calhoun to lie on the ground and count to fifty as he made his escape. Mr. Calhoun described the robber as a "taller Caucasian" man weighing 150-200 pounds. He testified that the robber stood six feet, two inches. Mr. Calhoun acknowledged that he may have told the police on the night of the robbery that the robber was five feet, eleven inches tall. He explained that it was a "difficult night," and his focus was on the robber's clothes because his face was well-concealed by the mask. Mr. Calhoun believed that the robber's gun was real. Mr. Calhoun estimated that the robber took twenty-two cartons of cigarettes and about $120. Mr. Calhoun explained that there are ten packs of cigarettes in one carton and twenty-two cartons of cigarettes in one case or box. Mr. Calhoun stated that the robber took a variety of light brand cigarettes such as Pall Mall's, Marlboro's, L&M's, Kool's, and Winston's. Mr. Calhoun was aware that the robber came from the

- 23 -

direction of the Stonewood Villages neighborhood. Because he was on the ground, he was unable to watch the robber leave.

The store's many surveillance cameras documented the robbery. Mr. Calhoun affirmed that he watched the footage which contained both video and audio. While the footage was played for the jury, Mr. Calhoun pointed out that the robber held the gun in his left hand. Based on the color of the cigarette boxes in the carton taken by the robber, Mr. Calhoun opined that the robber took Newport's, Pall Mall's, L&M's, and Marlboro's. He confirmed that he counted to fifty before getting up and dialing 9-1-1.

On cross-examination, Mr. Calhoun recalled telling the 911 dispatcher that the robber was thin, stood five foot eleven inches tall, and wore a green suede jacket, a "fake [brand] of Oakley's" sunglasses, and a dark, green mask. He gave the police the same description and also told the police that the robber weighed about 150 pounds, and was between the age of thirty-five and forty-five. Mr. Calhoun clarified that the robber demanded money from both the cash drawer and the safe.

Mr. Calhoun acknowledged that he told the police that a customer by the name of James Warrick was a possible suspect. He testified that he was "not in the right state of mind" when he identified Mr. Warrick as a potential suspect. Mr. Calhoun explained that he worked the morning shift after the robbery while he was still in "shock" from the incident. In hindsight, Mr. Calhoun admitted that he should not have been working so soon after the robbery. Mr. Warrick was the first customer to enter the store the day after the robbery and had the similar build and height as the robber. Mr. Calhoun obtained Mr. Warrick's name from his work identification badge. Mr. Calhoun recalled being "nervous" around Mr. Warrick. Mr. Calhoun testified that he does not believe Mr. Warrick robbed the store.

In his interview, Defendant identified himself in a screenshot of the surveillance footage. He admitted that he stole a carton of cigarettes which he sold in several bars. Cell phone analysis showed that Defendant received one incoming call at 5:47 p.m., and made three outgoing calls between 5:49 and 5:58 p.m. All four calls pinged off the cell phone towers in South Nashville. The record shows that Defendant sent text messages on November 19 and 20 offering to sell cartons of cigarettes.

### Count 9 – Twice Daily –Vultee Boulevard – November 20

Jason Hamilton was working at the Twice Daily convenience store, located at 1330 Vultee Boulevard on November 20, 2017, at approximately 11:45 p.m., when a man entered the store and asked for a pack of cigarettes. Earlier, Mr. Hamilton observed the man hold the door open for a customer who was leaving the store. When the man entered

the store, he was the only customer. Mr. Hamilton testified that when he turned around to hand the cigarettes to the man, the man pointed a black pistol at Mr. Hamilton and demanded "everything in the register" and a container of twenty-dollar bills from the safe. Mr. Hamilton estimated that he gave the man "[r]oughly" $160 in cash. After Mr. Hamilton handed the man the money from the register and the safe, the man ordered Mr. Hamilton to get on the ground and not look up. Mr. Hamilton testified that the man walked out of the store and to the left of the store in the direction of a neighborhood off of Briley Parkway. He did not observe the man arrive or leave the scene in a car. After the man was out of sight, Mr. Hamilton immediately locked the doors and called 911. He believed the man's gun was real. He described the robber as "an older white male, with blue eyes." Mr. Hamilton recalled that the man was dressed in "heavy" winter clothes, and wore a mask that covered his nose and mouth and a beanie or skullcap over his head. Mr. Hamilton identified himself and the robber in the surveillance footage of the robbery that was exhibited to the jury and played during his testimony. He pointed out that the robber held the gun in his left hand. On cross-examination, Mr. Hamilton recalled telling the police that he believed the robber to be "an older male" because the robber had wrinkles and bags underneath his eyes.

In his interview, Defendant identified himself as the person who robbed this store off of Briley Parkway. Analysis of Defendant's cell phone activity showed that he made an outgoing call at 12:01 a.m. which connected to a tower nearest the Twice Daily convenience store.

### Count 5 – Delta Express/Mapco – Harding Place – November 24

On November 24, 2017, Raouf Essa was stocking the shelves with cigarettes at the Delta Express/Mapco at 440 Harding Place, at 3:20 p.m., when a man entered the store and said, "Give me the money, you motherfucker." Mr. Essa turned around and saw a man pointing a small, black gun at him. Mr. Essa opened the cash register, took out the cash, and put it on the table. The man took all the money but would not leave. The man ordered Mr. Essa to the back of the store and threatened to hit Mr. Essa if Mr. Essa refused. They were halfway to the back when a customer entered the store. The man immediately turned around and fled. Mr. Essa testified that the man took "$200 or more." Mr. Essa testified that he was so overcome by the experience of just being robbed that he could not return to the front of the store. When the female customer saw Mr. Essa, he asked her to call the police. Mr. Essa testified that he remained in the back of the store until the police arrived because he was frightened. Mr. Essa testified that the robber, who was between the age of thirty and forty, stood five feet nine inches tall, and wore blue jeans, a jacket, and gloves. Both his head and part of his face up to his nose was covered. Mr. Essa recalled that the man wore a face mask. He revealed on cross-examination that the man's jacket also covered his head suggesting that the jacket had a hood. Mr. Essa recalled that the robber

wore prescription glasses, and not sunglasses because he was able to see the robber's eyes which were "[s]ort of green." Mr. Essa identified Defendant in the courtroom as the robber. He had also previously identified Defendant as the robber in an earlier hearing in December 2017.

Mr. Essa did not watch the robber as he left the store but watched the surveillance camera aimed outside the store and testified that the robber went around the store by the ice machine and the trash bin. Mr. Essa narrated the surveillance footage of the robbery as it was played for the jury. He identified himself, the robber, and the woman who entered the store during the robbery and called the police. Mr. Essa noted that the robber held the gun in his left hand.

In his interview, Defendant admitted that he robbed the store on "Harding." He identified himself in the screenshots of the store's surveillance footage. He also admitted that he drove to the market in his car, a gold Toyota Camry. He identified Richard Black as the man who drove the car away from the scene. Data from Defendant's phone showed that two outgoing calls were made at 3:37 p.m. and 3:59 p.m. Both calls communicated with a cell tower near the Mapco.

### Count 6 – Mapco Express – Nolensville Pike – November 25

Tamar Ishak testified that he was working at the Mapco Express at 3043 Nolensville Pike on November 25, 2017, shortly after midnight when a man wearing a face mask, grabbed a bottle of water from the cooler and placed it on the counter as if to pay. Mr. Ishak told the man to remove his mask three times but the man refused. After the third time, the man withdrew a large, black gun, pointed it at Mr. Ishak, "insulted" Mr. Ishak, and demanded that Mr. Ishak open the register and give him the money. Mr. Ishak gave the man the money as ordered. The man grabbed the money, ordered Mr. Ishak to look at the floor, and exited the store. Mr. Ishak stated that the man did not arrive on foot but had parked his car behind the store. Mr. Ishak testified that the man took about $200. Mr. Ishak described the robber as a white man, approximately forty to forty-five years old, of medium height, with green eyes. Mr. Ishak testified that the robber put on a pair of glasses before he insulted Mr. Ishak and ordered him to open the register. He confirmed that the robber was wearing black gloves. Mr. Ishak stated that he focused on the gun to determine whether it was real and according to him, the gun appeared to be real. Surveillance footage of the robbery was played for the jury. Mr. Ishak identified himself and the robber in the footage. He pointed out that the robber held the gun in his left hand and likewise grabbed the money with the same hand.

Ten days after the robbery, Mr. Ishak was working at another Mapco Express location when he saw a man who appeared to be the man who robbed the Mapco on

November 25, 2017. Mr. Ishak testified that this man was also white, wore the same clothes as the robber, and had the same color eyes. However, unlike the robber, this man's face was not covered by a face mask. Although the man did not rob the store, Mr. Ishak contacted the police. Mr. Ishak was asked to identify the man who robbed him in the courtroom but was unable to do so.

In his interview, Defendant admitted that he robbed the Mapco on Nolensville Road. He admitted that Mr. Black had parked the car in an alley behind the store. Data from Defendant's cell phone showed that four outgoing calls were made between 12:31 and 12:52 a.m. These calls connected to a cell tower in South Nashville near the Mapco on Nolensville Road.

### Count 8 – Delta Express – Thompson Lane – November 26

Stella Rice testified that on November 26, 2017, at approximately 5:00 p.m., she was working the register at the Delta Express at 18 Thompson Lane and watched as an elderly female customer was searching for drinks in the back of the store, when a man entered the store, pointed a big, black gun at her and said, "Bitch, give me the money or I'm going to kill you." Nervous, Ms. Rice tried to open the register as the man repeatedly demanded that she "give [him] the money now." She finally managed to open the register and stepped back as the man grabbed the money from inside the register and ran away in the direction of the laundromat. She stated that the man took $20-$28. Ms. Rice described the robber as an "older white male" dressed in a gray hoodie, blue jeans, black gloves, a black mask, and sunglasses. She stated that she was unable to identify the robber. She told police the robber was thirty-five to forty-five years old, stood five feet seven inches in height, and weighed 180 pounds. When asked later whether she was certain about the robber's height and weight, Ms. Rice testified that she knew the robber was taller than her because she is five feet seven. Ms. Rice stated that she was not familiar with guns but believed that the robber's gun was real. She did not see the robber leave the scene in a car. The store's surveillance footage of the robbery was played for the jury. Ms. Rice identified herself as the person standing behind the register. She also identified the robber who was holding the gun in his left hand, however, she added that the incident was "confusing."

In his interview, this was the only store Defendant denied robbing. He denied that he was the person depicted in the screenshot from the surveillance footage. However, his cell phone data showed that an outgoing call was made from his phone at 5:28 p.m. and an incoming call was received two minutes later. Both calls connected to a cell phone tower in South Nashville closest to the store.

### Count 7 – Mapco – Nolensville Pike – November 30

On November 30, 2017, around 9 p.m., Nathan Allen was waiting for his shift to wind down at the Mapco at 5040 Nolensville Pike when a man, whose face was covered, entered the store. The man explained that he had covered his face because the weather was cold outside. However, the man suddenly "lunge[d]" at Mr. Allen, pointed a black gun at him, and ordered Mr. Allen to "give [him] the money." Mr. Allen gave him $50 which was the exact amount Mapco kept in the register per its policy. Mr. Allen recalled that the robber wore a brown "tannish" jacket, blue jeans, a hat with a hood over it, sunglasses, and a "colorful" mask or scarf over his face. Mr. Allen told the police that the robber was in his thirties or forties, stood five feet nine inches in height, had brown hair, and was of average build. Mr. Allen identified himself and the robber on the store's surveillance footage which showed that the gun was in the robber's left hand.

In his interview, Defendant admitted that he robbed this store when told of its location on Nolensville Pike near Tusculum Road. Defendant stated that it was the "last" store he robbed. Defendant's cell phone received three incoming calls and made three outgoing calls from 8:30 to 9:16 p.m. All six calls communicated with a cell tower near the Mapco after the robbery. The day after the robbery, Defendant received a text message asking if he was "okay." Defendant replied, "I'm good brother! I did one last night but only got $55 pissed me off! Lol[.]" Cell phone call detail record analysis showed that incoming calls were made to Defendant's phone at 8:30, 8:40, and 9:06. p.m. Outgoing calls were made from his phone at 9:00, 9:12, and 9:16. The calls connected to towers in South Nashville closest to the site of the robbery.

**Other Proof at Trial**

MNPD Detective Chad Gish testified as an expert in the field of digital forensic analysis without objection. Detective Gish analyzed Defendant's cell phone, a black iPhone. He described how he performed a physical extraction of the phone's data. Detective Gish used the Cellebrite forensic software platform to extract the phone's text messages, web browser history, and search engine history. Detective Gish prepared an extraction report of Defendant's cell phone data relevant to the case. He testified that a review of Defendant's phone's Google search history revealed a search for "Gunshops in Nashville, Tennessee" on October 9, 2017 at 11:40 a.m.

Detective Gish narrowed the phone's text message history from November 9, 2017 to December 1, 2017. He testified that the following text message was sent from Defendant's phone to four different cell phone numbers: "Hey, brother, I have 23 cartons of cigarettes I'm trying to sell for 20. A carton. If you know anybody interested, give me a call." This text message was sent on the November 19, 2017, the day after Defendant robbed the Delta Gas Station on Murfreesboro Pike and took a case of cigarettes. In another text message sent on the same day, the cigarette brands were identified: "Do you know

anybody that buys cartons of cigarettes? I have like 25 cartons. Pall Mall Regular, Lites and Ultra Lites Winston, 2 cartons of Kools. Anyway, I have 23 cartons. I let them go for $20 a carton." In yet another text message from Defendant's phone, "I got. Pall Mall Regular and Menthol, Winston Lites, 2 Kools, and a few other cartons, but they are mostly regular." The next day, the following text message was sent regarding the sale of cigarettes: "Hey brother, are you interested in cartons of cigarettes $20 a carton, the only menthols I have is Kools and Pall Malls."

On November 23, 2017, a text message was sent from Defendant's phone stating, "Can you get us some H or what? I have money." On November 25, 2017, the following text message was sent from Defendant's phone: "What's up, brother? Just got back from a road trip to Indiana. I need to holler at you, brother. Call me asap. I'm sick as fuck and I have cash."

The day after the last reported robbery on November 30, 2017, Defendant's phone received a text message asking if he was "okay." The following response was given, "I'm good brother! I did one last night but only got $55 pissed me off! Lol[.]"

On cross-examination, Detective Gish agreed that he did not know the context of the messages or know the parties who sent messages to Defendant's phone. Altogether, he examined 280 search terms, 1,900 web histories, and 1,400 text messages.

Detective Joseph High, an expert in the law enforcement use of call detail records, analyzed the call detail records for Defendant's cell phone. Based on the use of Defendant's cell phone and its communication with different cell service towers, Detective High was able to determine the approximate locations of Defendant's cell phone from November 1, 2017 to December 3, 2017. Detective High narrowed his analysis relative to the commission of each of the robberies. Detective High compared Defendant's call location history to the location of each of the robberies and the times in which they occurred. As a matter of convenience, much of his testimony was provided along with the summary of the testimonies corresponding to each of the robberies.

On cross-examination, Detective High acknowledged that the two-mile radius he used to indicate the range of a cell phone tower was not reflective of a tower's actual range which can vary depending on whether the tower is located in a dense urban area or a sparse rural area. He acknowledged further that he did not consider nearby buildings, population density, weather patterns, or topography in his analysis. Detective High confirmed that Defendant lived near the location of several of the robberies. While he agreed that it was "possible" for Defendant's cell phone to be "sitting" at his house during some of the robberies, he maintained that it would be "inconsistent" with the data he analyzed.

Detective McGowen testified that he was the lead investigator on the robberies which all occurred in his assigned precinct, the Midtown Hills Precinct located in the Twelve South area near Belmont. He explained that although he did not investigate crimes which did not occur in his precinct, he received communication about crimes in other precincts within the MNPD. Detective McGowen believed that the robberies may have been committed by the same person because "[t]hey were all similar in nature" and "went down in a similar manner." Although there was surveillance footage of the robberies, there was no lead as to the identification of the robber. Canine units were called to a couple of the stores but were unable to track a suspect. Moreover, fingerprints lifted at the site of two of the robberies lacked any comparative value because the robber wore gloves to all but one of the robberies.

Detective McGowen got a break in the investigation on November 24, 2017, the day of the robbery at Delta Express on Harding Place. Detective McGowen obtained surveillance footage from the Family Medical Clinic located next door to the Delta Express at 476 Harding Place. The clinic had four cameras on its roof, two facing Harding Place and two monitoring its parking lot adjacent to the Delta Express. The surveillance footage was played at trial. The date and time stamp on the surveillance footage shows that on November 24, 2017, at 3:21 p.m., a gold Toyota Camry pulled into the entrance for the Delta Express, but drove past the Delta Express and backed into a space to the right of the market but clearly in the parking lot designated for the clinic. The driver and the passenger exited the Camry at the same time. The passenger walked around the back of the Camry and got in the driver seat while the driver appeared to put on a gray sweatshirt, walk around to the front passenger side, and grab something from inside the car. The front passenger door remained open as the driver stood with his back to the street. He appeared to be looking at whatever he grabbed from the car. The driver soon closed the car door and walked slowly to the Delta Express. He paused briefly when he reached the corner of the Delta Express building and continued walking and can no longer be seen by the clinic roof cameras. He disappeared from the camera's view at 3:24:24 p.m.

At 3:25:01 p.m., a blue sedan pulled directly in front of the Delta Express. According to Detective McGowen, this is the customer who entered the store during the robbery. The driver of the blue sedan stepped out of her vehicle and entered the market precisely one minute after the driver of the gold Camry entered the store. Approximately thirty seconds later, the driver of the gold Camry can be seen outside the front of the store walking to the Camry at a pace faster than when he entered the store as noted by Detective McGowen. The Camry immediately pulled away as soon as the original driver got into the front passenger side. The Camry is seen driving away from the Delta Express and through the clinic parking lot turning right out of the clinic parking lot. Detective McGowen testified that the Camry headed westbound on Harding Place.

- 30 -

Detective McGowen testified that this footage provided a breakthrough in the case because it was the first time the robbery suspect's vehicle was caught on camera. By watching this footage, Detective McGowan observed that the gold Toyota Camry had a mark on the hood, a sticker in the center of the rear windshield, and hurricane-style plastic rims.

Detective McGowen testified that two days after the Harding Place Delta Express robbery, he received another break in the case. He was in the parking lot of a Rent-a-Center, near Nolensville Pike and Tanksley Avenue, and south of Thompson Lane, when he saw a broken down late-model, gold Toyota Camry that matched the vehicle seen leaving the Delta Express on November 24. He explained that this model did not appear as if it had been moved in several weeks and acknowledged that he had seen this car previously at this location. However, this time, another late-model, gold, Toyota Camry was parked behind the broken-down model and a white man was either removing or putting on a license plate on the broken model. Detective McGowen continued to watch the man briefly before making his approach. He then activated the emergency equipment on his unmarked police vehicle, approached the man, and identified himself. As he approached, Detective McGowen saw a man in the driver's seat of the working Camry. The man standing behind the broken-down Camry was Richard Black. Defendant was seated in the other Camry.

Detective McGowen identified Defendant in the courtroom as the man he saw that day near the broken-down Camry. He testified that Defendant was seated in a car that matched the description of the suspect vehicle captured on the clinic surveillance camera. Furthermore, Defendant's car had the distinctive hurricane-style hub caps, the white sticker on the window, and a mark on the hood just like the car seen at the Harding Place Delta Express robbery. Defendant also matched the physical description of the man seen entering and exiting the Delta Express and Mr. Black matched the description of the man who drove the car after the robbery.

Defendant cooperated with Detective McGowen by tendering his driver's license, providing his cell phone number, and consenting to a search of his car. Nothing related to the robberies was found in the car. Because the robber appeared to be left-handed, Detective McGowen asked Defendant whether he was right-handed or left-handed and Defendant replied that he was left-handed. Detective McGowen released Defendant and Mr. Black because he lacked sufficient information to arrest them.

Three days later, Detective McGowen obtained a warrant to obtain Defendant's cell phone records from November 24-26, 2017. Upon receiving the records on December 3, 2017, Detective McGowan reviewed the records and noted that Defendant's phone was within half a mile, or less, from the Delta Express/Mapco on Harding Place. On December

5, 2017, Detective McGowen obtained a warrant to place a GPS tracking device on Defendant's car, and the device was installed on Defendant's car that day. However, the car was not involved in any further robberies during the time the tracking device was on Defendant's car from December 5-11, 2017.

Detective McGowen put out an alert to arrest Defendant, and he was arrested on December 11, 2017, by Officer Stanfield. Defendant was transported to the Midtown Hills precinct where he was advised of his rights. As previously addressed, Defendant waived his rights and agreed to talk to Detective McGowen and Detective Armstrong, and Defendant specifically denied being under the influence drugs or alcohol. The rights waiver form was admitted as an exhibit to the trial.

As set forth in the discussion of the motion to suppress, Detective McGowen explained the three parts of Defendant's interview and confirmed that all three parts of the interview were transcribed and accurately reflected the interviews. Detective McGowen acknowledged that as an interview technique he led Defendant to believe that "[he] knew [Defendant] was committing the robberies but [had] not stop[ped committing the robberies]." He agreed that the goal of the techniques is to "get to the truth." All three recordings were played for the jury.

Detective McGowen testified that after a smoke break, Defendant admitted to committing the robberies. During the post-smoke break interview, Detective McGowen showed Defendant still shots of the robber from the surveillance recordings from all the stores. An arrest report was generated for Defendant noting his age, height, and weight. At the time of the arrest, Defendant was fifty-four years old with green eyes. His height was listed at five-eleven, and his weight was listed at two hundred pounds. Detective McGowen created a map listing all the locations of the aggravated robberies, Defendant's mother's house where he stayed, the Rent-a-Center where Detective McGowen saw Defendant and Mr. Black, and the two late model Camrys.

On cross-examination, Detective McGowen acknowledged that lying is a permitted technique for interrogation. He agreed that in Part I of the interview, Defendant denied having robbed the stores six times. He also agreed that Defendant appeared somewhat emotional at the beginning of Part II of the interview. He could not recall the number of times they talked about Defendant's mother but confirmed that they did talk about her during the interview. Defendant was adamant that his mother was not involved in the robberies. Detective McGowen was aware that Defendant's mother drove a Grand Marquis. He acknowledged that one of the options discussed during the interview was to talk to Defendant's mother about the case.

Detective McGowen recalled that Defendant talked about going to rehab. He denied that Defendant was under the influence during the interview. Detective McGowen stated that he did not personally search Defendant. After the interview, Officer Stanfield called Detective McGowen to inform him that a tenth of a gram of heroin was found in Defendant's pocket while Defendant was being booked.

Detective McGowen prepared two photographic lineups. Defendant was among the six photographs shown on one of the two lineups. That lineup was presented on November 27, 2017, to Christine Kalcheim, who was shopping in the Dollar General Store on Eighth Avenue South when it was robbed. Ms. Kalcheim gave an account of that robbery and whether she saw the suspect in the lineup as part of the defense proof. Detective McGowen did not interview Mr. Black about the case. The investigation of Mr. Black's involvement was still ongoing. Detective McGowen was unable to enhance the license plate on the Camry seen on the clinic surveillance footage on the day of the Delta Express robbery. No property or money taken in the robberies was ever recovered.

**Defense proof**

Defendant did not testify but instead called two witnesses. The first witness, Christine Kalcheim testified that she was shopping in the Dollar General Store on Eighth Avenue South when it was robbed. However, before she entered the store, she spoke briefly with a man standing outside the store. According to Ms. Kalcheim, the man's face was not covered. She recalled that he was wearing a jacket with a hood. Ms. Kalcheim thought the man might be homeless so she planned on giving him a couple of dollars once she finished shopping.

Once inside the store, Ms. Kalcheim made her way down the first aisle which blocked her view of the cash registers. As she was shopping, she heard someone scream and then heard people running and a commotion at the back of the store. She saw two women who told her that there was a man with a gun inside the store. Ms. Kalcheim and the two women hid in the back office and watched for the gunman from the surveillance cameras inside the office. Fearful that the man might try to shoot his way into the back office, she and the two employees stayed on the ground. Ms. Kalcheim and the two employees remained in the office until they saw some customers enter the store. Once they saw customers, one of the employees dialed 9-1-1 while Ms. Kalcheim called MNPD. Ms. Kalcheim was later shown two photographic lineups. She chose and ranked three people among the first lineup who could have been the robber. She was unable to identify a suspect in the second lineup. At trial, she stated that she was unable to make a clear identification of the robber. She was also shown the surveillance footage of the robbery and testified that the robber wore the same clothes and appeared to be the same man she spoke to before she entered the store.

Defendant presented his admission and discharge summary from Buffalo Valley, a detox center. He was admitted on December 6, 2017, and discharged on December 10, 2017. Defendant's last witness was John Morris who testified as an expert in call detail records analysis. Mr. Morris disagreed with Detective High's analysis of Defendant's phone records. Specifically, he disagreed that a phone communicating with multiple towers in a call suggests that the cell phone was moving during the call. He explained that a person's cell phone can communicate with several cell towers during a single call while remaining in a fixed position. For instance, Mr. Morris testified that for Defendant's calls which communicated with the south Nashville towers, Defendant "very easily could have been sitting at his home for almost all of them." He testified that "there's no way to truly know [a person's location] using call detail records." He added that call detail records cannot be used to geolocate a cell phone's location because they lack specificity and are used primarily for billing.

Mr. Morris received engineering data or per call measurement data "PCMD" from Defendant's phone. He testified that in a couple of instances, the PCMD placed Defendant's cell phone in proximity to the aggravated robberies. He testified that only GPS data or 911 information can provide a "reasonable estimate" of a device's location. At most, the call detail records showed that Defendant's phone was in Nashville, not Memphis or Murfreesboro during the time frame of the call detail records. He acknowledged however, that even PCMD has limitations in geolocating a cellphone. He also acknowledged that when he plugged Defendant's information into his geolocation software, it did not contradict Detective High's findings. He agreed that Detective High's analysis accurately showed which cell tower communicated with Defendant's phone at a given time.

Based upon the foregoing evidence, the jury found Defendant guilty of aggravated robbery as charged in counts one through eleven and guilty of attempted aggravated robbery as charged in count twelve.

At sentencing, the State introduced Defendant's presentence report and certified copies of the convictions on which it relied for Defendant to be sentenced as a repeat violent offender. On December 11, 1989, Defendant pleaded guilty to one count of aggravated robbery in Cheatham County and received a ten-year sentence. The period of incarceration for this sentence was August 16, 1989 to September 23, 1992. On October 7, 1993, Defendant was convicted of three counts of aggravated robbery in Davidson County. He received a total effective sentence of twenty-four years consecutive to a parole violation. The period of incarceration for the Davidson County convictions was December 21, 1992 to September 23, 2011.

After the State made its argument for the repeat violent offender status and consecutive sentencing on the attempted aggravated robbery conviction, Defendant denied that the prior aggravated robbery convictions involved separate periods of incarceration. The trial court examined the qualifying judgments and Defendant's criminal record and determined that Defendant's prior qualifying convictions from Cheatham County and Davidson County involved separate periods of incarceration. Notably, the trial court found that Defendant could not have committed the Davidson County aggravated robbery on November 24, 1992, had he not been released on the 1989 Cheatham County conviction. Defense counsel did not challenge the trial court's determination that the two prior aggravated robberies involved separate periods of incarceration.

Based on the prior aggravated robbery convictions, the trial court found Defendant to be a repeat violent offender and sentenced him to concurrent terms of LWOP on his convictions for aggravated robbery in counts one through eleven. The trial court imposed a concurrent sentence of fifteen years for attempted aggravated robbery in count twelve. The trial court also ordered the sentences in this case to run consecutive to an unrelated sentence in Maury County. Defendant filed a timely motion for new trial which was subsequently denied following a hearing. Defendant filed a timely notice of appeal to this court.

**Analysis**

**I.    Motion to Sever the Counts**

Defendant claims that counts three through twelve should have been severed from each other and from counts one and two because they do not constitute a common scheme or plan and evidence of each count would not have been admissible at a trial for any of the other counts. The State contends the twelve counts were properly joined because they constitute a common scheme to obtain money to fuel Defendant's heroin addiction and evidence of the robberies was probative of Defendant's identity. We agree with the State.

This Court reviews a trial court's decision to consolidate or sever offenses for an abuse of discretion. *Spicer v. State*, 12 S.W.3d 438, 444-45 (Tenn. 2000); *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999), *overruled on other grounds by State v. Copeland*, 226 S.W.3d 287 (Tenn. 2007). Discretion is abused when the trial court applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party. *State v. Garrett*, 331 S.W.3d 392, 401 (Tenn. 2011) (citing *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010)). Discretion is also abused when the trial court "failed to consider the relevant factors provided by higher courts as guidance for determining an

issue." *Garrett,* 331 S.W.3d at 401 (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

In this case, we consider whether joinder was proper in light of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure which states: "If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." *See Spicer,* 12 S.W.3d at 444 (review under Tenn. R. Crim. P. 14(b), rather than the "same or similar character" standard of Tenn. R. Crim. P. 8(b) where defendant has formally moved for a severance). *See State v. Dotson*, 254 S.W.3d 378, 386 n. 5 (Tenn. 2008) (emphasizing that Rule 14(b)(1) "requires only that evidence of 'one' offense, not 'each' offense, be admissible at the trial of the others").

Although there has been greater emphasis on the second prong – whether the evidence of one crime would be admissible in the trial of the other – to determine whether a severance should have been granted under Rule 14(b)(1), *id*. at 386; as this court has observed, "there are two prongs, and we must assume that each serves its own purpose." *State v. Hallock*, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993) *cf. State v. Raymond Griffin,* No. W2001-01332-CCA-R3-CD, 2002 WL 1482689, at *7 (Tenn. Crim. App. Mar. 15, 2002) ("[b]ecause we find that no 'common scheme or plan' existed, it is unnecessary to proceed to the second requirement of the severance test, i.e., the admissibility of the evidence of one crime upon the trial of the others").

Under the first prong, Tennessee recognizes three categories of a common scheme or plan: (1) "signature crimes," (2) "offenses that are part of a larger, continuing plan or conspiracy," and (3) "offenses that are all part of the same criminal transaction." *Dotson,* 254 S.W.3d at 387, n.6 (citing *Shirley*, 6 S.W.3d at 248); *see also State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999). Because the State argues only that the robberies fall under the second category, we will focus on whether the robberies constitute a larger, continuing plan or conspiracy.

"The larger, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." *Hallock*, 875 S.W.2d at 290. While this court has previously recognized that "the larger, continuing plan category has typically been restricted to cases involving crime sprees, where the defendant commits several crimes quite closely in time to one another," *State v. Allen Prentice Blye*, No. E2001-01375-CCA-R3-CD, 2002 WL 31487524, at *6 (Tenn. Crim. App. Nov.1, 2002), we do not ignore that "crimes committed in furtherance of a plan [] has a readily distinguishable goal, not simply a string of similar offenses." *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004); *see also* Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[12][c]

(5th ed. 2005) ("[t]he unifying concept of crimes admitted under this theory is not their high degree of similarity but the common goal or purpose toward which each crime is directed"). Therefore, "[e]ach of the challenged offenses must serve to further the goal or plan in existence at the time of the commission of the first offense." *State v. Timothy Leron Brown*, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at *28 (Tenn. Crim. App. Apr. 8, 2019) (citing *State v. Jawaune Massey*, No. E2013-01047-CCA-R3-CD, 2014 WL 3661490, at *32 (Tenn. Crim. App. July 23, 2014).

This category requires evidence of a "'working plan' whereby the subsequent offenses are predictable or probable from the defendant's determination to commit the initial offenses (or vice versa)," otherwise the subsequent offenses cannot constitute parts of a larger, continuing plan. *Jawaune Massey*, 2014 WL 3661490, at *31 (quoting *Blye,* 2002 WL 31487524, at *6); *see State v. William Ramsey,* No. M2001-02735-CCA-R3-CD, 2003 WL 21658589, at *9 (Tenn. Crim. App. July 15, 2003) (consolidation of aggravated robbery and theft offenses proper, although committed four months apart, where "there was substantial evidence that both the theft and vandalism of the vehicle and the aggravated robbery of [the victim] were committed for the same purpose of retaliating against [the victim's husband]").

This court has held that "shared motivation for two otherwise unrelated crimes is not sufficient to establish a 'common scheme or plan.'" *State v. Prentice,* 113 S.W.3d 326, 332 (Tenn. Crim. App. 2001) (State's suggestion that Defendant committed two aggravated assault offenses to terrorize and intimidate his wife was insufficient to establish a continuing plan or conspiracy offenses where the offenses were unrelated in time, location, and character). In considering the category of a larger, continuing plan or conspiracy, we review the trial court's decision in light of three cases cited by Defendant as supporting authority, *State v. Adams,* 859 S.W. 2d 359 (Tenn. Crim. App. 1992); *State v. Hallock,* S.W.2d 285 (Tenn. Crim. App. 1993); and *State v. Griffin,* No. W2001-01332-CCA-R3-CD, 2002 WL 1482689 (Tenn. Crim. App. 2002).

In *Adams,* the defendant was charged along with a co-defendant with robbing a convenience store and then one hour later, robbing and killing a foreign exchange student three miles from the convenience store. 859 S.W.2d at 362. The trial court consolidated the two offenses under Rules 8 and 13. *Id.* On appeal, the State argued that both crimes were committed to obtain money to purchase drugs, but did not introduce any evidence in support of that position. *Id.* The defendant gave a statement about the felony murder case. *Id.* at 361. He admitted that he "was there" when the victim was killed but claimed that the co-defendant shot and robbed the victim. *Id.* "No physical evidence linked the cases together except the evidence that both crimes were committed by the same two persons." *Id.* This court found the State's "suggestion of shared motivation" insufficient to establish a common scheme or plan to justify consolidation of the two crimes. *Id.* Although the trial

court erred in ordering consolidation, this court held that the error was harmless because proof of guilt against the defendant in both cases was legally sufficient. *Id.* at 363.

In *Hallock,* the defendant was charged in a five-count indictment of sexually assaulting his two minor children. 875 S.W.2d at 288-89. The crimes were similar in nature and were committed in the same house during the same approximate period of time. *Id.* at 289. The victims clearly identified the defendant as the perpetrator. *Id*. at 292*.* Moreover, the defendant confessed to the offenses. *Id.* at 289. This court held that the crimes failed to satisfy the first prong of the severance test because they did not satisfy any of the categories of a common scheme or plan. *Id*. at 289-90. The court specifically rejected a possible theory that the defendant had a continuing plan or conspiracy to sexually abuse the victims for the purpose of gratification by use of the following hypothetical:

> The fallacy inherent in this thinking is easily exposed by the following example: X is on trial for three counts of burglary, each involving a different building, a different form of entry, and a different day. His overall purpose, however, was to acquire money for college. Clearly, without more, X is entitled to severance under Rule 14(b)(1).

*Id.* at 290. Although the trial court's denial of severance was erroneous, the error was harmless beyond a reasonable doubt in light of the overwhelming evidence of the defendant's guilt. *Id.* at 292.

In *Griffin,* the defendant challenged the consolidation of eight criminal episodes for trial. 2002 WL 1482689, at *1. The eight criminal episodes occurred within a six-week period, targeted eight different homes, and led to thirty-two indictments and twenty-five charged offenses. *Id.* at *1-*4. The defendant confessed to seven of the eight criminal episodes but gave no reason or motivation for his actions. *Id.* The trial court consolidated the eight episodes because they were part of a "larger, continuing plan or conspiracy" and evidence of each offense would be admissible in the trial of the others to show identity and lack of mistake. *Id.* at *6. The State argued that the offenses were part of a common scheme or plan "to drive around the City of Memphis at night in order to target particular individuals for robbery." *Id.* *7. In rejecting the State's argument, this court looked to the hypothetical of the three burglaries in *Hallock. Id.* This court held the trial court erred in consolidating the eight criminal episodes into a single trial because the criminal episodes were not united by a common goal or purpose, *Id.* "[I]n the absence of a unifying common goal or purpose which connect the individual robberies and accompanying crimes, other than simply the perpetration of multiple offenses, the Appellant is entitled to severance of the eight criminal episodes." *Id.* As was the situation in *Adams* and *Hallock,* the error in consolidating the eight criminal episodes in a single trial was harmless due to the overwhelming evidence of the defendant's guilt. *Id.* at *8.

- 38 -

Turning to the second prong of a severance ruling, we recognize that whether two or more offenses should be tried together under Rule 14(b)(1) is an issue of relevance. *Garrett*, 331 S.W.3d at 402 (quoting *Spicer,* 12 S.W.3d at 445). Because joining offenses "involves admitting proof of crimes committed on one occasion while attempting to prove crimes committed on a separate occasion, the provisions of evidence rule 404(b) are implicated." *State v. Demeko Gerard Duckworth*, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085, at *14 (Tenn. Crim. App. May 10, 2013) (citing *Garrett,* 331 S.W.3d at 402). Rule 404(b) of the Rules of Evidence provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, such evidence may be admissible "for other purposes." Tenn. R. Evid. 404(b). "Other purposes" may include "identity (including motive and common scheme or plan), intent, rebuttal of accident or mistake[.]" *Id.* Advisory Commission Comment. To be clear, "the mere existence of a common scheme or plan is not a proper justification for admitting evidence of other crimes." *Hallock*, 876 S.W.2d at 292.

Before a trial court may deny a severance request, it must hold a hearing on the motion and conclude from the evidence and argument presented at the hearing that (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of one of the offenses is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant. *Dotson*, 254 S.W.3d at 387 (citing *Spicer*, 12 S.W.3d at 445).

In this case, the record shows that the trial court held a hearing on the motion to sever and the motion to reconsider. Based on the evidence and the arguments presented at the hearings, the trial court concluded that the robberies were part of a larger, continuing plan, that proof of one robbery would be admissible in a separate trial of the other robberies, and that the probative value of the offenses was not outweighed by the danger of unfair prejudice to Defendant. In denying the motion to sever, the trial court relied on the following reasons and factual findings:

> Here, identity is a material issue at trial in all [c]ounts of the [i]ndictment, and the offenses charged constitute a common scheme or plan under Rule 8(b) in that they were part of a larger, continuing plan or conspiracy. That is, the proof shows a "working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial."
>
> Detective McGowan testified about his investigation of the string of robberies, which included (1) the November 26, 2017 stop of the Defendant

- 39 -

to determine who used the vehicle viewed on surveillance footage, (2) attempts at tracking the Defendant's vehicle (no robberies were committed while the vehicle was being tracked), and (3) obtaining the Defendant's phone records, which showed his phone pinged near the robbery locations at the time the robberies were committed. The evidence to establish each individual robbery charge is "so related to each other that proof of one tends to establish the others." The probative value is particularly significant and outweighs potential prejudice. This Court finds the charges have been properly consolidated pursuant to Rule 8(b) of the Tennessee Rules of Criminal Procedure. The Defendant's motion to sever counts is denied.

(internal citations omitted). In its order denying Defendant's motion to reconsider, the trial court found "addition[al]" reasons to deny Defendant's request for severance. Relying heavily on *State v. Jamie Paul Click,* No. E2015-01769-CCA-R3-CD, 2017 WL 1189750 (Tenn. Crim. App. Mar. 30, 2017), the trial court found that the similar nature and location of the robberies, the narrow time frame in which the robberies were committed, and the limited geographical region where the offenses occurred supported permissive joinder.

We conclude that the trial court did not abuse its discretion in denying Defendant's request to sever the offenses under Rule 14(b). The first prong of the severance test was met because the State established proof of a common scheme or plan via a continuing plan. In his interview with Detective McGowen and Detective Armstrong, Defendant admitted repeatedly that he needed money to finance his heroin addiction and robbing convenience stores accomplished that goal:

> It didn't start happening [un]til I got on the heroin. And the only reason I did it was to, I couldn't find a job. If I could find a job, I'd have worked to pay for my heroin.

Defendant confessed the same to his mother as grounds for his arrest: "It was the damn heroin that done it." He also told her that he committed the robberies "to feed [his] heroin addiction." In his own words, the robberies were the product of a continuing motive – to obtain money for heroin.

Because Defendant could not find employment, he "resorted back to what [he] knew." Defendant developed a plan based on his experience as a seasoned robber. Defendant admitted to the detectives that he and his brother "have always been robbers" and that "[b]ack in the 80[s] . . . early 90[s]. The motels were the easiest things to rob . . . cause that's w[h]ere you got the good money[.]" In this instance, Defendant's mission was not to get rich, but to steal enough money to buy heroin to hold him over for a few days.

When the heroin ran out, he would rob another store. To accomplish his stated goal, Defendant chose convenience stores:

> You go into a store now man, [if] you, any store you go into, it it's at, if it's dark. You go in the store and you give them a 20 dollar bill, what do they do with it[?] Boom, drop it right in the safe, you know what I mean[?] You know. You know there's never hardly no money in the registers. *And I knew that.* So I wasn't doing it to get rich, I was just doing to get enough drugs to, heroin to hold me over for a couple days, you know what I mean[?]

(emphasis added).

We are unpersuaded by Defendant's reliance on *Adams, Hallock,* and *Griffin.* What was lacking in those cases*,* is not lacking in this case. In this case, Defendant expressed a goal and motivation for his crimes and developed a working plan toward accomplishing that goal. He targeted convenience stores because he knew they had just enough money on hand for him to buy just enough heroin to support his addiction. Based on his knowledge and plan of robbing convenience stores, he also knew that additional money could be find in a tube in the store's safe if the cash drawer was insufficient for his needs. Additionally, if Defendant could not steal enough money to support his addiction, he took cartons of cigarettes which he then sold to obtain money to support his addiction. The proof in this case includes many text messages Defendant sent soliciting interest in the purchase of cigarettes the day after he stole the cartons of cigarettes from the Delta Gas Station on November 18. Four days after the text messages, Defendant sent another text message stating that he had money to buy "H." In both *Adams* and *Griffin,* there was no proof of a working plan connecting the consolidated crimes. *Adams,* 859 S.W.at 362; *Griffin,* 2002 WL 1482689, at *7. As mentioned previously, the Supreme Court in *Hallock,* soundly rejected any "misapprehend[sion]" that the defendant's purpose for sexually abusing the minor victims, without more, was entitled to severance under the category of a continuing plan. 875 S.W.2d at 290.

Altogether, Defendant robbed eleven convenience stores, located in a confined geographic area, over a short period of time, and robbed them in the same manner, dressed in similar type clothing, and armed with the same type of weapon.. Defendant robbed the same type of store, located in the same geographic area of Nashville, within a four-week period. He employed similar methods of entering and robbing the stores. Additionally, Defendant targeted stores in close proximity to each other. Detective McGowan testified that he only investigated cases covered by the Midtown Hills Precinct. Accordingly, his investigation of Defendant's case was limited to the robberies which occurred in a geographic range from "12th South to Donelson" areas in "southern Nashville." While the victims' descriptions of Defendant varied somewhat, they also shared similarities. For

- 41 -

instance, the robber wore the same type of face and head covering, and usually wore gloves, and a hooded jacket. In some of the robberies he was seen wearing the same jacket. He was always armed with a gun which he held in his left hand as depicted in the surveillance footage. The trial court did not abuse its discretion in finding that the proof established a larger, continuing plan with the crimes committed in close proximity sufficient to meet the first prong under the severance test.

Next, in this case, proof of each robbery would be admissible at trial for the other robberies because identity was a material issue in the case and the evidence of the offenses was probative of establishing Defendant's identity as the robber. Although each convenience store documented the robberies, from the first robbery of the Dollar General Store on November 2, through the November 20 robbery of the Twice Daily, none of the stores' employees could identify the robber. Two employees, Mr. Calhoun from the Delta Gas Station robbery on November 18 (count four), and Mr. Hamilton from the Twice Daily robbery on November 20 (count nine), noted however, that the robber held the gun in his left hand.

Detective McGowen received his first break in the case on November 25, when surveillance video from the Family Medical Clinic located next door to the Delta Express/Mapco on Harding Place, documented activities related to the robbery including the make, model and color of the vehicle and the men involved. That surveillance footage matched up with Detective McGowen's observation of Defendant and his gold, late-model Toyota Camry the day after the Delta Express/Mapco robbery on November 24, 2017. Based on his brief conversation with Defendant, Detective McGowen learned that Defendant was left-handed. He also obtained a record of Defendant's cell phone history showing that Defendant was in the vicinity of the robbed stores around the timeframe of the robberies on November 2, 9, 15, 18, 20, 24, 25, and 30, 2017. Surveillance footage and still photographs from the robberies showed that Defendant was similarly dressed in a hoodie or hooded jacket, gloves, and a face covering. The robber was always armed with a gun which he held in his left hand as depicted in the surveillance footage. Proof of the robberies was therefore relevant to a material issue in the case and highly probative of Defendant's identity as the robber. Thus, the second prong of the severance test was met.

Defendant's reliance on *Adams* and *Hallock* is misplaced on the second prong. In *Hallock,* evidence of the defendant's conduct against victim K was not relevant in a trial for acts committed against victim J, because each victim identified the defendant as her rapist, and none of the offenses was relevant for some other material issue such as intent, motive, absence of mistake and accident. 875 S.W.2d 292. Therefore, evidence of the crimes involving victim K was not admissible in a trial involving crimes against victim J. *Id.* In *Adams,* the trial court made no findings on whether the other crimes were admissible for some other purpose. This court held that the felony-murder of the foreign exchange

- 42 -

student could have been tried without proof or reference from the convenience store robbery, and vice versa. 859 S.W.2d at 362. *Griffin* is not helpful to Defendant because although the trial court held that proof of the crimes was admissible for identity and absence of mistake, this court declined to review the trial court's finding because the first prong had not been met. 2002 WL 1482689, at *7.

Furthermore, the trial court instructed the jury to consider each count separately. Here, the jury was instructed that "[t]he crime charged or included in each count of the indictment is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it." Without evidence to the contrary, we presume the jury followed the trial court's instructions. *State v. Williams*, 929 S.W.2d 385, 387 (Tenn. Crim. App. 1996); *see also State v. Harbison,* 539 S.W.3d 149, 163 (Tenn. 2018) ("[t]o overcome this presumption, the defendant must show by clear and convincing evidence that the jury failed to follow the trial court's instructions"). The trial court did not abuse its discretion in denying Defendant's motion to sever the counts and allow him eleven separate trials. He is not entitled to relief.

## II. Motion to Suppress Defendant's Interview

Defendant claims the trial court erred in denying his motion to suppress his admissions in his interview because they were involuntarily made due to his intoxication. Defendant also claims his statement was the product of police coercion because the detectives threatened to arrest Defendant's mother if he did not confess. The State counters that the trial court properly denied the suppression motion because the record reflects that Defendant made his statements freely and voluntarily. Because the record does not preponderate against the trial court's findings against Defendant, we affirm the denial of the motion to suppress.

We review a trial court's ruling on a motion to suppress by affording the prevailing party the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *State v. Martin*, 505 S.W.3d 492, 500 (Tenn. 2016). The trial court's findings of fact in a suppression hearing are upheld unless the evidence preponderates against them. *Martin*, 505 S.W.3d at 500; *Keith*, 978 S.W.2d at 864. The application of the law to the facts found by the trial court is a question of law and is reviewed on appeal de novo. *State v. Clayton*, 535 S.W.3d 829, 846 (Tenn. 2017); *see also State v. Hawkins*, 519 S.W.3d 1, 32-33 (Tenn. 2017); *State v. Willis*, 496 S.W.3d 653, 686 (Tenn. 2016); *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013).

The right against self-incrimination is protected under both the Federal and State constitutions. *See* U.S. Const. amend. V; Tenn. Const. art. 1, § 9. The Fifth Amendment,

made applicable to the States by the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." *Vega v. Tekoh*, 142 S. Ct. 2095, 2101 (2022) (quoting *Malloy v. Hogan*, 378 U.S. 1, 6 (1964)). This Clause "permits a person to refuse to testify against himself at a criminal trial in which he is a defendant" and "also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Id.* (citations omitted).

"The test of voluntariness for confessions under Article 1, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test for voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). A voluntary statement must be free from "any sort of threats or violence, nor obtained by any direct or implied promises, however, slight, nor by exertion of any improper influence." *Id.* (quoting *Bram v. United States,* 168 U.S. 532, 542-43 (1897)). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Id.* (citing *State v. Brimmer,* 876 S.W.2d 75, 79 (Tenn. 1994)).

"[C]oercive police activity is a necessary predicate to finding that a confession is not voluntary." *Brimmer*, 876 S.W.2d at 79. "[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." *Clime*r, 400 S.W.3d at 568. The same standard of analysis applies whether a statement is the product of physical intimidation, psychological pressure, or intoxication. Intoxication does not automatically render a confession invalid. *State v. Green*, 613 S.W.2d 229, 232-33 (Tenn. Crim. App. 1980) (a statement provided by a suspect who is under the influence of drugs is admissible so long as the statement is coherent); *State v. Perry*, 13 S.W.3d 724, 739 (Tenn. Crim. App. 1999) (hearing impaired and chronic glue using defendant's waiver of *Miranda* rights was knowing and voluntary where the effect of defendant's last ingestion of glue was "going away" at the time he read his rights, defendant possessed above-average intelligence and provided generally responsive and coherent answers to officer's questions); *State v. Terrence Lee Hannah,* No. 01C01-9711-CC-00540, 1998 WL 765713, *5-*6 (Tenn. Crim. App. Nov. 4, 1998) (despite a blood alcohol content of 0.28 an hour before his interview and the smell of alcohol on his breath, defendant gave a knowing and intelligent statement where he was coherent and responsive to questioning and was no longer incapacitated according to questioning officers); *State v. Roy Laverne Morris,* No. 10, 1991 WL 16289, at *2 (Tenn. Crim. App. Feb. 13, 1991) (despite measuring 0.20 on intoximeter, defendant's waiver was knowing and voluntary where he gave a "coherent and rational" explanation of events).

To determine the voluntariness of a statement, the court must examine the totality of the circumstances. *Id.* (quoting *Dickerson v. United States,* 530 U.S. 428, 434 (2000)). Circumstances relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep [,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (quoting *State v. Huddleston*, 924 S.W.2d 666, 671(Tenn. 1996)).

In its order denying the motion to suppress Defendant's interview, the trial court summarized the evidence at the suppression hearing and analyzed it in light of the pertinent law. The trial court resolved the conflicting testimony relevant to Defendant's arguments that his confession was involuntary due to intoxication and police coercion in the State's favor. Once so determined, the presumption of correctness may only be overcome on appeal if the evidence in the record preponderates against the trial court's findings. *See Martin*, 505 S.W.3d at 500; *Keith*, 978 S.W.2d at 864. Here, the evidence in the record overwhelmingly supports the trial court's findings.

First, the trial court accredited the testimony of the officers on the issue of intoxication and specifically found "no evidence" of Defendant's faculties to be so compromised or impaired to render his statement involuntary and unknowing:

> The Court credits the testimony of the officers, and audio and video recordings support[] their testimony. The video recording of the interview shows the Defendant engaged in coherent narratives in response to police questioning. There is no evidence the Defendant's faculties were so impaired that his statement could not be considered the product of a "free mind and rational intellect."

Neither Officer Stanfield nor Detective McGowen noticed anything to suggest that Defendant was under the influence. Their testimonies are corroborated by the videotape of the interview which shows that throughout the two-hour questioning, Defendant was cooperative, displayed a sober demeanor, was aware of the gravity of the situation, and

gave answers that were logical and responsive to the questions asked. As noted by the trial court, Defendant did not admit to committing all of the aggravated robberies. He admitted to specific robberies, identified himself in the screenshots of surveillance footage, and provided information on what he stole and recalled the ethnicity of a particular store employee. As Defendant points out in his sufficiency challenge, he denied robbing the Delta Express on November 26 which was the target of count eight. In doing so, he stated that he always wore glasses whereas the robber seen in the pertinent surveillance footage was not wearing any glasses. Defendant's recollection and recitation of the facts pertinent to the robberies show that his statement was the product of "a free mind and rational intellect."

Moreover, in a phone call to his mother directly following the interview, Defendant "bet" that he could pass a drug test "right then" and stated that he had not used heroin since he was released from detox. The totality of the circumstances of the interview reflect a statement that was voluntarily and knowingly made.

Next, in denying Defendant's claim that his statement was the product of police coercion, the trial court accredited Detective McGowen's testimony concerning any reference to Defendant's mother in the interview:

> Defendant testified the police gave him the impression his mother was driving the getaway car at a robbery. He said he was worried about what would happen to her and ultimately confessed because he did not want the police to bother his mother. He testified he believed the police were going to arrest his mother.
>
> Detective [McGowen] denied ever telling the Defendant his mother was at risk because her car was used for a robbery. Detective [McGowen] explained that in the context of questioning the Defendant about the November 5 robbery at Walgreens, Detective [McGowen] informed the Defendant that witnesses had mentioned seeing a light Mercury Grand Marquis, and the police knew the Defendant's mother owned a car consistent with the witness description.
>
> The Court credits the detective's testimony. Again, the interview recordings and transcripts belie the Defendant's characterization of his interview. During the interview and the smoke break, the Defendant denied using his mother's vehicle during any of the robberies he committed.

\*\*\*

- 46 -

Although the Defendant initially misunderstood the detective several times during the interview, the detectives informed the Defendant they waited to stop him while he was driving, instead of going inside his mother's home (where the Defendant lived) to make the arrest, because they did not want to bother his mother. During those points in the conversation, the Defendant expressed appreciation for the officers' respect. He stated he appreciated they had not involved his mother or her home in their investigation, and he appreciated they waited to arrest him outside her neighbors view while acknowledging he had been "drug out of there [his mother's home] by police before."

Based on the totality of the evidence, the Court finds no evidence of coercive police activity or exertion of any improper influence to render the Defendant's confession as not made voluntarily. The Defendant's statements are admissible.

Affording the State the "strongest legitimate view of the proof and all reasonable and legitimate inferences that may be drawn from that evidence" as the prevailing party, we agree with the trial court and conclude that Defendant's statement was not the product of undue police coercion concerning his mother.

## III.    Motion to Disqualify the Office of the District Attorney General

Defendant claims the trial court erred in denying his motion to disqualify the Davidson County District Attorney's Office because District Attorney General Glenn Funk had an actual conflict of interest in having previously represented Defendant on a case which later served as a qualifying conviction for Defendant to be sentenced as a repeat violent offender. Defendant argues that General Funk's conversations with ADA King on her decision to seek the repeat violent offender designation in his case and General Funk's agreement with the decision before and after the State filed its notice and after General Funk learned of the conflict constituted participation in the prosecution of Defendant's case requiring disqualification of the entire office. He contends further that the trial court's failure to disqualify the Davidson County District Attorney's Office constitutes constitutional structural error requiring automatic reversal.

The State argues that the trial court properly exercised its discretion in denying Defendant's motion to disqualify the District Attorney's Office because General Funk did not prosecute the case and he did not reveal any confidences gained from the former representation to ADA King. The State also argues that given the mandatory nature of the repeat violent offender, the trial court properly determined that disqualification was not

necessary where Defendant had sufficient prior felony convictions to qualify as a repeat violent offender.

A trial court's decision to disqualify an attorney for a conflict of interest and to impute an attorney's conflict of interest upon the attorney's firm is reviewed for an abuse of discretion. *State v. Orrick*, 592 S.W.3d 877, 882 (Tenn. Crim. App. 2018) (citing *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001)); *State v. Mark Steven Treuchet*, No. E2019-00663-CCA-R3-CD, 2020 WL 4346756, at *15 (Tenn. Crim. App. July 29, 2020); *State v. Derek T. Grooms*, No. W2019-01324-CCA-R10-CD, 2020 WL 9171956, at *9 (Tenn. Crim. App. Nov. 25, 2020).

Discretion is abused by applying an incorrect legal standard or reaching a decision which is against logic or reasoning that caused an injustice to the party complaining. *Orrick*, 592 S.W.3d at 882 (citing *Shirley*, 6 S.W.3d at 247). In determining whether the trial court has applied an incorrect legal standard, "appellate courts are not required to defer to a trial court's interpretation of the Code of Professional Responsibility or to its decisions regarding legal standards applicable to a particular disqualification motion." *State v. Coulter*, 67 S.W.3d 3, 28 (Tenn. Crim. App. 2001) (citations omitted), *abrogated on other grounds by State v. Jackson*, 173 S.W.3d 401 (Tenn. 2005).

In addressing this issue, the trial court must determine whether the prosecutor who has the conflict of interest participated in the ongoing prosecution, including the disclosure of any confidences, and whether the prosecution has established that the prosecutor has been screened from the prosecution. *Coulter*, 67 S.W.3d at 30; *see also Clinard*, 46 S.W.3d at 184. An actual conflict of interest "includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (quoting *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000)). A prosecutor's actual conflict of interest and disqualification does not require vicarious disqualification of the "entire district attorney general's office . . . so long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution." *State v. Tate*, 925 S.W.2d 548, 556-57 (Tenn. Crim. App. 1995); *see also Mattress v. State*, 564 S.W.2d 678, 680 (Tenn. Crim. App. 1977) (trial court did not abuse its discretion by determining that an appearance of impropriety was not created by disqualifying the assistant district attorney with an actual conflict of interest where another assistant attorney general prosecuted the case).

When a prosecutor has an actual conflict of interest creating an appearance of impropriety, " [e]arly and adequate screening . . . should resolve [the] problem.' " *Coulter*, 67 S.W.3d at 32 (quoting *Tate*, 925 S.W.2d at 556). "The appearance of impropriety is not the central concern" in the context of a defense attorney joining a district attorney's office. *Id.* 67 S.W.3d at 32-33. Rather, the issue is "whether a disclosure of confidential

information would violate a criminal defendant's constitutional rights, including the privilege against self-incrimination, the effective assistance of counsel, a fair and impartial trial, and due process of law." *Id.* A confidence has been defined as any "information protected by the attorney-client privilege under applicable law." *Tate*, 925 S.W.2d at 554. Our review is informed by Rule 1.11, the specialized rule regarding public service attorneys. *See Orrick*, 592 S.W.3d at 891 (Rule 1.11 applies to whether a disqualified prosecutor's conflict of interests should be imputed upon a district attorney general's office).

There is no real dispute between the parties that General Funk had an actual conflict of interest disqualifying him from participating in Defendant's prosecution. *See* Tenn. Sup. Ct. Rule 8, RPC 1.11(d)(2)(i), 1.9(a). General Funk testified at the motion hearing that he represented Defendant on the 1989 Cheatham County aggravated robbery conviction and that he prepared and filed a motion to suppress in that case. The issue here is whether he participated in the prosecution of Defendant by talking with ADA King after he learned of the conflict and agreed with her decision to seek the repeat violent offender designation.

We turn first to the trial court's findings:

The Court credits the testimony of General Funk as well as [ADA] King's statement she did not state the Defendant['] s name to General Funk during her case synopsis. Regardless, the Court finds no basis for recusal in light of the mandatory nature of the repeat violent offender sentencing statute.

The statute mandates a trial court "shall sentence a defendant who qualifies as a repeat violent offender to life without possibility of parole. The defense argues the limited use of the repeat violent offender statute demonstrates its discretionary use; however, as the Court noted during the hearing, only a finite number of offenders qualify for "repeat violent offender status given the statutes requirement of having two or more qualifying convictions involving separate periods of incarceration. Here, should the Defendant be convicted of any of the twelve aggravated robberies for which he is charged, he unequivocally qualifies as a repeat violent offender in light of his criminal history, which includes an aggravated robbery conviction from his 1989 guilty plea in Cheatham County and his three aggravated robbery convictions from his 1993 guilty plea in Davidson County, as the convictions in these two cases involved separate periods of incarceration.

(Internal citations omitted).

The trial court accredited the testimony of General Funk and ADA King regarding their first conversation about the case. The trial court however, made no findings regarding the second conversation. The trial court instead relied on the mandatory nature of the repeat violent offender statute to deny the motion to disqualify.

In his reply brief, Defendant makes the following assertion about the possible disclosure of confidential information in the second conversation:

> At that point, ADA King knew that General Funk had confidential information about [Defendant], and that General Funk approved a life without parole sentence. While General Funk did not convey the secrets [Defendant] had shared with him to ADA King, his repeated approval of seeking a life without parole sentence of [Defendant] raises the possibility – or at least the perception – that his knowledge of [Defendant]'s confidences factored into his reaffirmed support for a life without parole sentence.

We cannot make the leap Defendant does regarding the conversations between General Funk and ADA King. While we are likewise concerned that General Funk spoke with ADA King about the case after the motion to disqualify had been filed, there is nothing in the record to show that a confidence was divulged relevant to the current prosecution and materially adverse to Defendant. There is no proof that General Funk revealed any confidences gained from his former representation relevant to the prosecution of the case. Defendant's 1989 Cheatham County conviction was a matter of public record.

Moreover, as found by the trial court, the status of repeat violent offender did not hinge on General Funk's approval of the request. The status of repeat violent offender is made out by the State upon showing at a hearing, following conviction of a defendant of a triggering felony, (1) that defendant has been convicted of two felonies and is among those specified in Tennessee Code Annotated section 40-35-120(a)(1)-(2) and (b)(1); and (2) that each of the convictions were for separate offenses, committed at different times and on separate occasions. The documentary evidence either satisfies the statutory requirements or it fails in some respect. *See State v. Milton Lebron Byrd*, No. E2006-02619-CCA-R3-CD, 2008 WL 886269, at *6 (Tenn. Crim. App. Apr. 2, 2008), ("repeat violent offender statute is constitutional and pursuant to the statute, the trial court must order "the mandatory sentence of life without the possibility of parole"); *State v. Thomas D. Stanton*, No. M2003-03049-CCA-R3-CD, 2005 WL 639139, at *14-15 (Tenn. Crim. App. Mar. 17, 2005) (modifying the defendant's sentence from life plus 37 years because "the trial court was required to impose a sentence of life imprisonment without the possibility of parole as to the defendant's aggravated robbery conviction" because his prior convictions made his subject to the repeat violent offender sentencing statute).

The State introduced certified copies of Defendant's prior violent felonies at the sentencing hearing. Defendant did not object to the validity of the judgments. Rather, Defendant challenged whether the prior aggravated robbery convictions involved separate periods of incarceration to which the trial court reviewed and recited Defendant's criminal history beginning with the 1989 Cheatham County conviction. Defendant did not object or put on any rebuttal proof to the trial court's finding that Defendant's prior aggravated robbery convictions resulted in distinct periods of incarceration. Accordingly, the State's evidence of Defendant's repeat violent offender status was uncontroverted and sufficient to support a finding beyond a reasonable doubt that Defendant is a repeat violent offender as defined in the relevant statutory provision. As such, the trial court was required to impose a sentence of life imprisonment without the possibility of parole as to Defendant's aggravated robbery convictions.

Although this court is concerned by the apparent lack of screening procedure and General Funk's decision to have a second conversation with ADA King in which he reiterated his earlier assessment for the repeat violent offender status *after* learning from Defendant's motion to disqualify that he had previously represented Defendant, we are constrained to hold that the trial court did not abuse its discretion.

## IV.  Sufficiency of the Evidence

Defendant claims the evidence is insufficient to support his conviction for the November 26 aggravated robbery of the Delta Express on Thompson Lane as charged in count eight of the indictment because the evidence did not establish his identity as the robber beyond a reasonable doubt. The State contends the evidence is sufficient to support the conviction.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. "A guilty verdict 'removes the presumption of innocence and replaces it with a presumption of guilt.'" *State v. Reynolds,* 635 S.W.3d 893, 914 (Tenn. 2021) (quoting *State v. Gentry,* 538 S.W.3d 413, 420 (Tenn. 2017)); *State v. Allison,* 618 S.W.3d 24, 33 (Tenn. 2021). The burden is shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *Allison,* 618 S.W.3d at 33; *State v. Jones,* 589 S.W.3d 747, 760 (Tenn. 2019). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *Allison,* 618 S.W.3d at 33-34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also* Tenn. R. App. P. 13(e).

On appeal, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v.*

*Weems*, 619 S.W.3d 208, 221 (Tenn. 2021) (same standard of review applies when examining the sufficiency of the evidence and a motion for judgment of acquittal). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Allison,* 618 S.W.3d at 34; *Jones,* 589 S.W.3d at 760. "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

The identity of the perpetrator is an essential element of any crime. *Miller,* 638 S.W.3d at 158; *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Identity may be established by circumstantial evidence alone. *Miller,* 638 S.W.3d at 158 (citing *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002)).

Defendant argues that the lack of proof in this count was illustrated by the prosecutor's closing argument where she relied on proof of the other robberies to bolster proof of the robbery in count eight. Defendant argues that this court may not consider proof from the other robberies as supporting evidence for this conviction. To be clear, Defendant is not challenging the propriety of the prosecutor's comment during closing argument as a stand-alone issue. It is well-established that arguments of counsel are not evidence. Here, the jury received this instruction and we presume that the jury followed it. *State v. Jordan*, 325 S.W.3d 1, 66 (Tenn. 2010); *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006)

The Delta Express employee, Ms. Rice, could not identify the robber. Of the robberies, this was the only one Defendant did not confess to committing. As proof connecting Defendant to this robbery, the State introduced Defendant's cell phone records showing that Defendant's phone communicated with a cell phone tower near the Thompson Lane Delta Express six minutes after the robbery. The robbery was committed at 5:12 p.m. Defendant's phone made an outgoing call at 5:28 p.m. and received an incoming call at 5:30 p.m. The State argues that surveillance footage and still photographs from the Delta Express robbery showed a man who was similar in size, build, and dress as Defendant was depicted in other robberies. Presuming the jury afforded the State all reasonable inferences from this evidence, we conclude the evidence was minimally but legally sufficient to establish Defendant's identity as the person who robbed the Delta Express as charged in count eight.

## V.     Plain Error Review of Double Jeopardy Claim on Count One and Two

If reviewed for plain error, Defendant claims counts one and two of the indictment violate the Double Jeopardy Clause because the evidence establishes a single robbery of a business.  He asks this Court to reverse and dismiss his conviction for aggravated robbery in either count one or count two.  Alternatively, he contends the convictions in counts one and two should be merged into a single conviction for aggravated robbery.  The State concedes that the two counts violate Double Jeopardy under plain error but contend they should be merged into a single conviction.  Upon reviewing this issue for plain error, we agree with the parties that counts one and two violate double jeopardy.  For the reasons provided, count two is merged into count one.

As the parties acknowledge, issues raised for the first time on appeal are waived. *See* Tenn. R. App. P. 36(a); *State v. Harbison,* 539 S.W.3d 149, 164 (Tenn. 2018) ("[t]o preserve the double jeopardy issue, [the defendant] had to raise it in his motion for new trial and appellate brief").  We may nevertheless use our discretion to review unpreserved errors and grant relief under the plain error doctrine.  *State v. Minor,* 546 S.W.3d 59, 65 (Tenn. 2018).  To demonstrate plain error, Defendant must show that: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was violated; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice.  *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021), *reh'g denied* (May 21, 2021), *cert. denied*, 142 S. Ct. 790 (2022) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016).  "[A]n appellate court need not consider all criteria when the record demonstrates that one of them cannot be established."  *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020).

"The Double Jeopardy Clause protects a person from being prosecuted twice 'for the same offence.'" *Denezpi v. United States*, 142 S.Ct. 1838, 1842 (2022); *see* U.S. Const. amend. V; Tenn. Const. art. I, § 10.  Under both the federal and our State constitutions, a defendant is protected against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.  *State v. Watkins,* 362 S.W.3d 530, 541 (Tenn. 2012).  This case concerns the third category.

This case also involves a unit-of-prosecution claim.  "Unit-of-prosecution claims arise when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the 'same offense.'"  *Id.* at 543.  In such instances, "courts determine whether a single offense is involved not by applying the *Blockburger* test, but rather by asking what act the legislature intended as the 'unit of prosecution' under the statute."  *Id.*  In Tennessee, the unit of prosecution for aggravated

robbery is the number of thefts, not the number of people threatened during the robbery. *State v. Franklin*, 130 S.W.3d 789, 797-98 (Tenn. Crim. App. 2003). When a defendant is charged with multiple counts of aggravated robbery based upon a single taking from a business, only one conviction can stand. *Id.* at 798.

Upon reviewing the record and the binding authority of *Franklin,* we agree with Defendant and accept the State's concession that separate convictions for aggravated robbery in counts one and two constitute multiple punishments for the same offense. *See also State v. James Carlos Ward,* No. M2009-00417-CCA-R3-CD, 2010 WL 1949155, at *9 (Tenn. Crim. App. May 14, 2010); *State v. Cedric Anthony,* No. W2004-00255-CCA-MR3-CD, 2004 WL 2848380, at *7 (Tenn. Crim. App. Dec. 10, 2004) (reducing convictions for two out of four counts of aggravated robbery to aggravated assault where defendant robbed one customer and the cash registers of three employees); *State v. Marcus Johnson*, No. W2002-00987-CCA-R3–CD, 2003 WL 22080778, at *11 (Tenn. Crim. App. Sept. 4, 2003) (modifying one conviction for especially aggravated robbery to aggravated assault where two store employees were shot during a robbery in which money was taken from the store); *State v. Hezekiah Cooper,* No. W2005-02481-CCA-R3-CD, 2007 WL 4462991, at *12 (Tenn. Crim. App. Dec. 20, 2007) (three of defendant's four aggravated robbery convictions committed in the presence of mother and her three children in their family home violated double jeopardy where defendant's theft of one of the children's Christmas present constituted a single theft from the residence).

The record shows that Defendant committed a single theft from Walgreens on Donelson Pike on November 11, by the display of a handgun, albeit in the presence of three employees, Ms. Oropeza, Ms. Adcock, and Ms. Hunter. Although Defendant is raising this issue for the first time on appeal, we grant relief under plain error "to correct an error of constitutional dimension and to prevent manifest injustice" just as we did in *Franklin.* 130 S.W.3d at 798.

In terms of relief, we conclude that merger of the two counts is the proper remedy. In *Franklin,* this court modified the second aggravated robbery conviction because the evidence supported a conviction for the lesser included offense of aggravated assault. *Id.* As both parties point out, in *Franklin,* the jury was instructed on aggravated assault as a lesser-included offense. The jury was not charged with aggravated assault as a lesser included offense in this case. Thus, modifying either count to aggravated assault is not an option here.

Defendant urges this court to dismiss either count, or in the alternative, merge the two counts. The State contends that merger of the two counts is the proper remedy based on *State v. Zirkle*, 910 S.W.2d 874, 898 (Tenn. Crim. App. 1995) (discussing merger of convictions for first degree premeditated murder and felony murder). Merger is required

when a jury returns guilty verdicts on two counts representing alternative theories of the same offense. *State v. Davidson*, 509 S.W.3d 156, 217 (Tenn. 2016). Here, the dual aggravated robbery convictions in counts one and two represented alternative theories of committing robbery in the Walgreens. In so holding, this court relies on both *Zirkle* and *State v. Travei Pryor,* No. E2012-02638-CCA-R3-CD, 2015 WL 9271433 (Tenn. Crim. App. Dec. 18, 2015). Although *Pryor* involved the break-in of a residence, the defendant was charged and convicted of four counts of aggravated robbery including two alternative theories of aggravated robbery against a resident of the home, and two alternative theories of aggravated robbery against a guest. 2015 WL 9271433, at *5. This court affirmed the aggravated robbery convictions but remanded the case in part to merge the two aggravated robbery convictions against the resident and the two aggravated robbery convictions against the guest. *Id.* at *10.

The trial court here erred in failing to merge counts one and two. We remand for entry of corrected judgments merging count two into count one on two separate uniform judgment documents as set forth in *State v. Berry,* 503 S.W.3d 360 364-65 (Tenn. 2015). In all other respects, we affirm the judgment of the trial court.

## Conclusion

In summary, we remand for entry of separate judgment forms for count one and count two reflecting the merged conviction. The judgments of the trial court are affirmed in all other respects.

_____
JILL BARTEE AYERS, JUDGE